48 CCPA

### Application of Ernest C. ADAMS, Jr., and Alfred H. Free.

#### Patent Appeal No. 6600.

United States Court of Customs and Patent Appeals.

Dec. 8, 1960.

526

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., George R. Jones, Washington, D. C., K. M. LeFever, Elkhart, Ind., John A. Dienner, Chicago, Ill. (Bruno J. Verbeck, Chicago, Ill., of counsel), for appellants.

° Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

WORLEY, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of claims 1, 2, and 3 of appellants' application for a patent for a diagnostic reagent and method on two grounds, viz., that the claims are unpatentable over the prior art, and for lack of utility. If the first ground is valid it will not be necessary to consider the second. Appellants have here limited their appeal to claims 1 and 2 which read:

"1. A diagnostic composition for use in determining gastric acidity comprising the reaction product of a solid carboxylic cation-exchange resin and 2,6-diamino-3-phenylazopyridine.

"2. A method of determining gastric acidity which comprises orally administering to a subject 2,6-diamino-3-phenylazopyridine as a complex with a solid carboxylic cation-exchange resin and then testing subsequently voided urine for the presence of 2,6-diamino-3-phenylazopyridine and metabolites thereof."

The references relied on are:

Segal et al. Proc. Soc. Exp. Biol. and Med. Vol. 74, May 1950, pp. 218–220.

U. S. Dispensatory, Vol. 23, p. 1323, 1943.

The claims involve a diagnostic composition and method for determining the presence or absence of hydrochloric acid in the human stomach. The composition is prepared by contacting a carboxylic cation-exchange resin with 2,6-diamino-3-phenylazopyridine hydrochloride, a dye which is known commercially by the names Pyridium and Mallophene. The resin complex so formed is administered to a person orally in a small dose. If there is sufficient hydrochloric acid present in the gastric juice, as in the case of normal people, the cationic 2,6-diamino-3-phenylazopyridine is released from the resin and is subsequently excreted in the urine where its presence may be determined by several tests, one of which is to add acid to the urine containing the dye and measure the intensity of the reddish-orange color produced with a spectrophotometer. If the gastric juice of the person being tested is anacid, and therefore abnormal, only nominal amounts of the 2,6-diamino-3-phenylazopyridine will appear in the urine.

The primary reference relied on by the examiner and the board is Segal et al. which discloses a method for determining gastric acidity by administering orally a carboxylic cation exchange resin complexed with an indicator compound which may be a dye, radioactive material, or any other easily detectable substance. Quinine hydrochloride is the specific in-

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of* *Judge O'CONNELL*, pursuant to provisions of Section 294(d), Title 28 United States Code.

dicator disclosed. The quininium ion is displaced from the resin by the hydrochloric acid present in the gastric juice and is excreted in the urine where its presence is detected by the intensity of fluorescence observed under ultraviolet light. The additional reference relied on is the U. S. Dispensatory citation which designates Pyridium and Mallophene, both trade names, as phenylazodiaminopyridine hydrochloride, a urinary antiseptic that colors urine reddish-orange.

The examiner rejected the claims as unpatentable over Segal in view of the Dispensatory reference, asserting that it did not involve invention to use Pyridium as the dye in the Segal method. The board, in affirming the examiner, found that since Pyridium is a dye and a well-known therapeutic agent, its use in the Segal method "would not be unobvious and would not require the exercise of invention."

Appellants argue that Segal is merely an invitation to experiment with an infinite number of dyes and, therefore, does not anticipate the claimed method. It is also urged that the Board of Appeals mistakenly assumed that Pyridium was structurally similar to quinine, and that a comparison of the molecular structure of the two compounds shows that they are not structurally similar. In addition, appellants point out that it is not Pyridium which appears in the urine of normal subjects taking appellants' complex, but 2,6-diamino-3-phenylazopyridine.

We have given full weight to the arguments advanced by appellants but agree with the board that it would not be unobvious to one skilled in the art to use a dye such as Pyridium in the method employed by Segal.

The specific indicator compound disclosed in Segal is quinine hydrochloride from which the quininium cation is taken up by the cation exchange resin. Upon ingestion the quinine resin complex is acted upon by the acid present in the gastric juice, and the basic quinine is subsequently excreted in the urine. In appellants' method 2,6-diamino-3-phenylazopyridine hydrochloride (Pyridium) is reacted with the cation exchange resin and the cationic 2,6 diamino-3-phenylazopyridine is taken up by the resin, forming the complex which upon ingestion is acted upon by the stomach acid and the basic pyridine is later excreted in the urine. Thus, it is apparent that the only difference in the two methods lies in appellants' use of Pyridium as the complexing agent.

The Segal reference clearly suggests that the indicator used might be "a dye * * * or any other easily detectable substance." That does not appear to be an invitation to experiment with an infinite number of dyes as contended by appellants since it necessarily follows from reading Segal that the dyes suggested for use must be non-toxic and must color urine. It seems evident that one looking for a dye with such properties would naturally select Pyridium since, as appellants concede, it is well known to be non-toxic, coupled with the fact that it is a dye that colors urine reddish-orange. While we agree with appellants that the chemical structure of Pyridium is somewhat different from that of quinine hydrochloride, nevertheless they are both hydrogen chloride salts and no reason is shown why they would not be expected to react analogously with a cation-exchange resin, as in fact they do. It is well settled that a patent cannot be properly granted for the discovery of a result which would flow naturally from the teaching of the prior art. In re Gauerke, 86 F.2d 330, 24 CCPA 725; In re Kepler, 132 F.2d 130, 30 CCPA 726; and In re Eisenhut, 245 F.2d 481, 44 CCPA 974. Here we see nothing patentable in using Pyridium in the Segal method since its selection would follow naturally from knowledge of the prior art.

In view of our holding it is unnecessary to consider the second ground of rejection.

The decision is affirmed.

Affirmed.