299 F.2d 793
 TRIUMPH HOSIERY MILLS, INC., Hudson Hosiery Company, Burlington Industries, Inc., Claussner Hosiery Company, and McCallum Hosiery Company, Appellees and Cross-Appellants,
v.
ALAMANCE INDUSTRIES, INC., Kayser-Roth Corporation, and Kayser-Roth Hosiery Company, Inc., Appellants and Cross-Appellees.
 No. 8374.
 United States Court of Appeals Fourth Circuit.
 Argued October 12, 1961.
 Decided February 8, 1962.
 
 Simon H. Rifkind, New York City (Jay H. Topkis, New York City, Welch Jordan, Greensboro, N. C., Paul B. Bell, Charlotte, N. C., Paul, Weiss, Rifkind, Wharton & Garrison, John G. Simon, John Lyon, New York City, Eaton, Bell, Hunt & Seltzer, and Charles B. Park, III, Charlotte, N. C., on brief), for appellants and cross-appellees.
 John W. Malley, Washington, D. C. (Carl G. Love, C. Willard Hayes and Cushman, Darby & Cushman, Washington, D. C., and Thornton H. Brooks, David Rabin and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on the brief), for appellees and cross-appellants.
 Before BRYAN and BELL, Circuit Judges, and CRAVEN, District Judge.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 A patent for a surgical stocking, marketed as Supp-hose, was attacked in the District Court as fraudulently procured, lacking in inventiveness and as misused. On these grounds a declaratory judgment was sought of its invalidity. Besides denying these charges of the plaintiff non-patentees, the defendant patentees accused them of infringement, asked appropriate enforcement of the patent, and additionally charged the plaintiffs with unfair competition.
 
 
 2
 The trial judge found a purposeful omission of the patentees to disclose in the patent application a product that will be referred to as the Burlington stocking, which he noted was very similar to the one described in the application and was generally known in the art for several years before the filing of the application. Thereupon he held the patent for naught.
 
 
 3
 Thoughtfully, to prevent a new trial in the event his determination was not sustained on appeal, he ruled on the remaining accusations and recriminations in regard to the patent. In this he struck down nine of its claims as wanting in novelty and definiteness. The remaining fifteen claims he thought valid. He found unwitting infringement by the non-patentees of eleven of the claims and acquitted them of unfair competition. But, in the end, he concluded that the patent had been rendered unenforceable by the excessive and unlawful restraint imposed by the patentees in a license of it.
 
 
 4
 The initial appeal is by the defendant patentees against the finding of fraud in the procurement of the patent and the alternate determination of misuse. They do not ask review of the dismissal of the claim of unfair competition. Cross-appealing, the plaintiff non-patentees pray the vacation of the alternate findings of validity and infringement.
 
 
 5
 The plaintiffs are Triumph Hosiery Mills, Inc., Hudson Hosiery Company, Burlington Industries, Inc., Claussner Hosiery Company and McCallum Hosiery Company. McCallum is a division of Claussner. These are the non-patentees; they are engaged in the manufacture and sale, among other things, of ladies' nylon hosiery.
 
 
 6
 The patent in suit, No. 2,841,971, was issued July 8, 1958 on an application filed August 19, 1957 by Joseph H. Bird, Marvin H. Comer, Charlie A. Miles, and Ralph C. Braxton. The application and patent were assigned to the defendant Alamance Industries, Inc., a corporation engaged in acquiring, holding and licensing inventions and patents obtained from the defendant Kayser-Roth Corporation and others. Defendant Kayser-Roth Hosiery Company, Inc. operates as a division of Kayser-Roth Corporation, both manufacturing and selling hosiery. The three defendants we call the patentees.
 
 
 7
 "Compressive Stocking" — the title of the patent — is an explicit description of the article constituting the centerpiece of this litigation. The Bird patent strove to perfect a woman's stocking which would be therapeutically successful in compressing the leg of the wearer and at the same time offer a fashionable appearance. Since before August 1955 Burlington had made and sold a ladies' hosiery that it now asserts to be a compressive stocking with properties like those specified and claimed in the Bird patent. Thus, strife between the Burlington and Bird merchandise lies at the heart of this litigation.
 
 
 8
 Apparently for many years the market had been demanding and research had been seeking a surgical-type stocking for women affording therapeutic attributes, but which would be at the same time sheer and otherwise attractive. The therapy was directed to the relief of vascular ailments and fatigue of the leg. The most effective surgical stockings in use relied upon the elasticity of rubber yarns to give the necessary repressive force. But they were neither popular nor practicable because the rubber made them heavy, thick and hot; they were expensive, unattractive and did not launder readily. See Johnson & Johnson v. Carolina Lee Knitting Co., 258 F.2d 593 (4 Cir.1958).
 
 
 9
 The rival stockings in this suit were all full-fashioned and of unplied yarn. Burlington's were of three types. The first was knit with a single thread or "end" of monofilament nylon yarn, in alternating courses or loops, having fifteen turns of twist per inch in one direction to impart torque, the intervening courses being of the same yarn and turns but with the turns in an opposite twist. The second was similar to the first save that two ends of unplied yarn were used in each course. The third was like the other two but every course had three ends. Each of these styles was knit in a two-carrier system on the usual full-fashioned knitting machine. Prior to October 1955 the nylon monofilament torque yarn used was fifteen denier and heat-set. The patentees were aware of all of the contemporary and earlier stockings made by Burlington when they filed the application for the Bird patent.
 
 
 10
 A description of the Bird stocking is given in the fact findings of the District Court as follows:
 
 
 11
 "7. The Bird patent specifications and claims disclose a full-fashioned knit ladies' nylon stocking having three or more unplied monofilament nylon yarn ends of false twist spindle processed yarn wherein at least three ends of the false twist yarn of the same rotational direction are knit in some courses of the knitted fabric, and three ends or more of the opposite rotational direction are knit in other courses of the knitted fabric, forming alternatively distorted loop stitches throughout the stocking. The knitted fabric forming the stocking is described as providing high compressive support for the leg of a wearer."
 
 
 12
 Actually, the patent was broader, specifying and claiming a stocking with "multiple" or a "plurality" of ends, which would include two ends.
 
 
 13
 I. Concededly, the Burlington stocking was the closest of all the prior products to the Bird stocking. However, it was not listed or cited in the patent application. The District Judge found that the applicants at no time brought the Burlington three-end 15 denier stocking to the attention of the United States Patent Office or its Examiner. This omission he found intentional. It was in his judgment a deliberate withholding of information in order to deceive the Patent Office. He further concluded that the claims of the patent would not have been allowed if the Burlington stocking had been brought to the attention of the Patent Office.
 
 
 14
 The Court heard and weighed the evidence sedulously, evincing a comprehensive knowledge of the proof and a firm grasp of the legal principles it invoked. But we cannot agree that the evidence adduced meets the required standard of a "clear and definite" showing of fraud. Armour & Co. v. Wilson & Co., 274 F.2d 143, 148 (7 Cir.1960). Indeed, an analysis of the testimony precludes, we think, the suggestion of fraud.
 
 
 15
 To begin with, the sole witness testifying on whether or not before the patent was issued the Patent Office was apprised of the Burlington three-end 15 denier garment, was positive that it had been. Time, place and occasion were given specifically and without contradiction. This witness stated that the disclosure was made by one of the patentees' present trial counsel. Although the lawyer asked to testify to the point, the Court felt it should not hear him as his name had not been included in the advance listing of witnesses required by the pre-trial order. His offer to withdraw from the trial was rejected as coming too late, on the ground that he must have known before or at the start of the trial that this issue, on which his testimony was critical, would enter the case.
 
 
 16
 These reasons, we think, were outweighed by the right of the attorney to be heard. Especially is this so in view of the gravity of the accusation lodged against him and his clients.
 
 
 17
 Further, ignorance of the Examiner or the Patent Office of the existence of the Burlington stocking is not readily conceivable. Without question the patentees and their attorney had alluded to equivalent prior art in such patents as Neumager, No. 2,641,914; Tait, No. 2,636,369; and Weller, No. 2,755,616. Tait taught the use of three ends and Tait with Weller a stretch stocking. Incidentally, the Examiner on the Bird patent was the same person who had heard the Tait and Weller applications. Hence, he was familiar with the concept of plural ends composed of monofilament yarns knitted into a stretchable fabric, with the threads twisted to impart torque. Consequently, whether or not the applicants or their attorney specifically directed the Examiner to the Burlington article, the elements of its construction were generally known to him. The District Court might (and did) disagree with the Examiner as to the impact of the prior art on the Bird patent, but this is not tantamount to a finding of misconduct.
 
 
 18
 II. But the entire patent is invalid, in our opinion, for want of invention. At the same time it offends, by the breadth of its claims, the very plan and purpose of the patent law. We have no reason, therefore, to consider the alleged misuse of the patent or its infringement.
 
 
 19
 Claims 1 through 7 were adjudged by the District Court to be lacking in definiteness and anticipated by Burlington's three-end 15 denier stocking. The District Judge also found indefiniteness in Claims 19 and 20 and on that ground invalidated them too. He upheld Claims 8 to 18 inclusive and 20 to 25 inclusive as definite and valid. We can accept his subsidiary findings of fact without agreeing with his ultimate conclusion, whether it be one of fact or law, that the patent is valid in part. We do not see novelty in any of the claims and, taken together, we think they are impermissibly comprehensive.
 
 
 20
 The District Judge found Bird's not to be a primary patent or a pioneer in the field, but only a "secondary" patent, that is, one built upon antecedent prototypes. He allowed the patent on the "narrow basis" of a novelty he thought resided in its highly repressive force.
 
 
 21
 The specifications of the patent describe its product as "a knit stretchable and retractable garment fabric, particularly hosiery, the stitch loops of which are knit of multiple monofilament synthetic torque yarns to form a stocking which has sufficient compressive or binding force on the leg to be of therapeutic value to the wearer." (Emphasis added.) The specifications candidly disclose, too, that stockings of stretchable and retractable fabric had been long and well known to the art. They suggest that the difference between the Bird stocking and its nylon yarn predecessors lies in the latter's attainment of a vastly superior compressive force. In prefatory paragraphs it is explained:
 
 
 22
 "Heretofore, stockings having a satisfactory high compressive or binding force on the leg of the wearer have depended upon the inherent elasticity in the yarn or thread of which the stockings were knit. Some of these so-called `surgical' stockings have been knit throughout with an elastic (rubber), or elastic covered yarn, alone or in combination with plain yarn or crimped or curled synthetic stretch yarn. While some of these prior types of elastic stockings provide sufficient compressive force on the leg of the wearer, they are not as attractive as conventional monofilament stockings. Also, the prior elastic stockings which utilize rubber threads cause some people to have skin reactions and such stockings rapidly deteriorate with age and washings. Stockings made of crimped or curled synthetic stretch yarn do not have enough compressive force to be of any appreciable therapeutic value.
 
 
 23
 "Other types of stretchable and retractable stockings are currently being produced from various types of curled, crimped or torque nylon yarns, but such stockings are produced to fit a wide range of leg and foot sizes without any intention of compressing or binding the leg. * * *
 
 
 24
 "The compressive stocking of the present invention differs from prior stretchable stockings knit with crimped or torque yarns, since the stocking of the present invention has a high resistance to stretch and, therefore, a strong tendency to return to its normal relaxed position. The present compressive stockings are of particular therapeutic value to persons suffering from pathological conditions in the vascular system of the legs, such as often occur during pregnancy." (Emphasis added.)
 
 
 25
 Manifestly, the prior types did not give "enough" compressiveness; but the patent fabric does give "sufficient" compression to be of "appreciable therapeutic value". This added force is developed by the combination of previously known elements to produce this more effective result. The high-torque yarn for this stretchable and retractable stocking is produced by established methods, according to the specifications, "one of which is by a * * * false twisting operation * * * with the first twist being heat-set. * * *" Another, "Torque may also be imparted to the yarn by conventional and other equipment". The specifications further reveal that the yarn preferably used in the subject stocking is treated in the former manner. While the evidence in the trial emphasized that the temperature and duration of the heat were critical variants from the previously known process, these two factors are not disclosed in the patent. "The compressive stocking of the present invention" the specifications continue, "is preferably knit on a full-fashioned hosiery knitting machine by the well known carrier system.
 
 
 26
 "By using plural unplied high torque yarns of the same torque direction in each course with each of said yarns being free and movable independently of the other, greater compression is obtained. * * * This combined torque reaction results in a highly compressive fabric heretofore unattainable without the use of rubber yarns."
 
 
 27
 As we have seen, the Tait and Weller patents had taught the adaptation of multiple ends, consisting of monofilament yarns twisted to make them lively. The Burlington product had for several years preceding the Bird application included alternating courses of yarn of one twist and intervening courses of an opposite twist, and was heat-set.
 
 
 28
 As to compression, the patentees' own test charts attribute some measure of this desired property to prior art stockings, particularly the three-end 15 denier Burlington stocking. There was expert testimony by one of Burlington's witnesses that these stockings had therapeutic advantages. An initial decision by Burlington not to attempt to go further and achieve a result equivalent to patentees' Supp-hose was, as we read the findings of the District Judge, born of a fear that the result would not justify in sales a redesign of the stocking, not that it would lack compressiveness. This initial decision was later overruled, and the improvements were adopted.
 
 
 29
 Thus, it appears that the Bird stocking was no more than a reinforcement of the old. There was nothing original in it. It was but an extension of old ideas.
 
 
 30
 The patent cannot stand on the ground that it adopted a measure of strength beyond the prior art and thereby gained invention. In this the patent is merely meeting the test of criticality. But criticality is not invention. It is ably explained in Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 233 F. 2d 148, 152 (2 Cir.1955) as follows:
 
 
 31
 "* * * the mere location of the optimum conditions of use for a known composition of matter does not constitute `invention' so as entitle the discoverer thereof to a monopoly. That objective, however useful the final result, can be achieved by `patient experiment', * * * no inventive genius is necessary."
 
 
 32
 "It is well settled that a patent cannot be properly granted for the discovery of a result which would flow naturally from the teaching of the prior art." In re Adams, 284 F.2d 525, 527 (CCPA 1960). See also In re Pomeroy, 64 F.2d 681, 683, 20 CCPA 1026 (1933), where it is said, "It properly may be remarked that generally there is no invention in making a device strong enough to perform the function for which it is designed; that is, there is no invention in merely producing strength. We must look to the structure which produces it and determine whether invention lies there."
 
 
 33
 This principle is again aptly stated in Smith v. Nichols, 21 Wall. 112, 119, 88 U. S. 112, 119, 22 L.Ed. 566 (1875) in discussing a patent relating to elastic woven fabric:
 
 
 34
 "But a mere carrying forward of new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent."
 
 
 35
 More pertinently, the Court had just said of the patent there involved:
 
 
 36
 "The evidence before us leaves to the complainant none of the particulars claimed as of his invention, except perhaps greater tightness of the weaving, a firmer grasping of the elastic cords by the weft threads half round above and below, and greater beauty and value of the fabric."
 
 
 37
 This single virtue was held to be no manifestation of invention.
 
 
 38
 True, a combination of old elements may be patentable if they "perform or produce a new, different or additional function or operation * * * than that theretofore performed or produced by them." Sobeloff, C. J. in Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir. 1961). See also, O. M. I. Corp. of America v. Kelsh Instrument Co., 279 F.2d 579, 584 (4 Cir. 1960). However, no new function has been produced by the Bird patent, for confessedly the prior art had embraced yarn support-type stockings with some compression. Bird added nothing in "function or operation"; it merely augmented the force of features already existent in earlier stockings.
 
 
 39
 Moreover, the improvement in the stocking was a step obvious to one familiar with the need and method of manufacture. The District Judge's findings make this altogether clear:
 
 
 40
 "31. It was obvious to one having ordinary skill in this industry to improve the support characteristics of all nylon stretch monofilament stockings by making them heavier or tighter by such obvious expedients as increasing the total denier, by adding additional ends of yarn in each course, or by increasing the denier of the individual yarns, or by adding additional narrowings, * * *
 
 
 41
 "32. It was obvious to one having ordinary skill in the art of knitting full-fashioned hosiery that to decrease the width of the fabric additional narrowings are to be added, resulting in a tighter fitting stocking for the same volume leg.
 
 
 42
 "33. It was obvious to one having ordinary skill in the art of knitting full-fashioned hosiery that by progressing from one end to two ends in a stocking greater power for support would be obtained, and going from two ends to three ends more power would be obtained, and going from three ends to four ends even more power would be obtained.
 
 
 43
 "35. It was known in 1955 and was obvious to produce high torque heat-set nylon monofilament yarns, with from 10 to 50 turns, for knitting ladies stockings to impart stretchable properties."
 
 
 44
 The record contains the frank testimony of three of the four inventors to the obviousness of the patented process. They stated that the addition of denier and ends would be an obvious way of increasing the force and gripping power of the stocking.
 
 
 45
 On this score alone the Bird stocking is declared unpatentable by statute, 35 U. S.C. § 103 providing that "A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." In their briefs the sponsors do not rest the patent on the number of ends or the denier in its product. They assert, and the trial court has found, inventiveness in the compression obtained with an all-yarn thread — a pressure not before achieved by any such stocking. To the argument of earlier knowledge and use in the art, and of the obviousness of the improvement, they rejoin that the patent made the "break-through" from rubber to whole yarn for a surgical, support stocking. Citing their Supp-hose, they proclaim it succeeded where others failed: it achieved notable commercial success and has the sincere flattery of industrial imitation.
 
 
 46
 But these contentions admitted, they do not establish patentability. Noteworthy, the patentees do not pinpoint the inventiveness. However significant and true, their assertions for the patent do not turn the old into the new, the obvious into the ingenious.
 
 
 47
 Utility is mistaken in these arguments for novelty. Utility alone is not patentable. As said in McClain v. Ortmayer, 141 U.S. 419, 429, 12 S.Ct. 76, 79, 35 L. Ed. 800 (1891): "While * * * in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that —, much less of its patentable novelty." Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 356, 59 S.Ct. 897, 900, 83 L.Ed. 1334 (1939) declares that, "* * * similarly without significance on the question of novelty is the fact that, as plaintiff claims, utility resulted and commercial success followed from what patentees did."
 
 
 48
 In Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) Justice Jackson also wrote:
 
 
 49
 "The Court of Appeals and the respondent both lean heavily on evidence that this device filled a longfelt want and has enjoyed commercial success. But commercial success without invention will not make patentability."
 
 
 50
 Justice Douglas concurring added, with Justice Black's agreement,
 
 
 51
 "The standard of patentability is a constitutional standard; and the question of the validity of a patent is a question of law. * * * No `finding of fact' can be a substitute for it in any case." 340 U.S. 154, 156, 71 S.Ct. 132.
 
 
 52
 We cite these two cases only to the point of the weight to be accorded the factor of utility. They both mention the "flash of genius" or "inventive genius" test, and we are aware that there is some question as to the validity of this test in view of the insertion of 35 U.S.C. § 103 by the 1952 amendment. See Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir.1960); Fairchild v. Poe, 259 F.2d 329 (5 Cir. 1958); Fisch v. Gould, 246 F.2d 5 (3 Cir. 1957); Fowler v. Vimcar Sales Co., 216 F.2d 263, 265 (9 Cir.1954); 2 U.S.Cong. & Admin.News 1952 at 2399, 2411. We are not now called upon to take a position on this question.
 
 
 53
 While the commercial success of Supphose is impressive, it is subject to close scrutiny. Again in McClain v. Ortmayer, supra, 141 U.S. at 428, 12 S.Ct. at 79, the Court admonished:
 
 
 54
 "That the extent to which a patented device has gone into use is an unsafe criterion even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising, activity in putting the goods upon the market, and large commissions to dealers, as by the intrinsic merit of the articles themselves. The popularity of a proprietary medicine, for instance, would be an unsafe criterion of its real value, since it is a notorious fact that the extent to which such preparations are sold is very largely dependent upon the liberality with which they are advertised, and the attractive manner in which they are put up and exposed to the eye of the purchaser. * * *" Nor is the Bird Patent saved by the statutory presumption arising from the patent itself, 35 U.S.C. § 282. This presumptive validity is but prima facie. Chesapeake & Ohio Ry. Co. v. Kaltenbach, 95 F.2d 801 (4 Cir.1938). It is readily seen that in assessing the prior art, the Patent Examiner failed to accord proper significance to the Burlington and previous developments. But this omission aside, the evidence generally rebuts the presumption, for a generous preponderance of the evidence proves the want of either originality or ingenuity. Indeed, it can be said, if necessary, that the proof on this head goes beyond a reasonable doubt. Evidence of such stature in respect to novelty and invention warrants, further, the conclusion in law that the presumption has been overborne and the patent invalid. Blish, Mize & Silliman Hardware Co. v. Time Saver Tools, 236 F. 2d 913, 916 (10 Cir.1956).
 
 
 55
 The invalidation of the patent is further proclaimed, and with the most emphasis, by the patent's impermissible reach. Its claims cover a stocking of multiple or a plurality of ends — no less than two, but more without limit.
 
 
 56
 The claims would encompass a stocking of any number of ends exceeding one; they would certainly question any stocking made of unplied monofilament torque yarn providing a compression greater than the pressures shown in Table 1 of the specifications. In fact, some of the claims are not dependent upon any specified compressiveness whatsoever. For example, the first seven claims give no pressures at all, while Nos. 17, 18, 19 and 20 call for a "sufficient" or "therapeutic" support.
 
 
 57
 The uncertainties and confusion arising from such a patent would be intolerable. Infringement would be difficult to judge, for just when the patentees' manufacture was within or without the patent would not be readily apparent to a competitor. The patent would seem to embrace a therapeutic unplied monofilament torque nylon stocking with a compression even below the minimum pressures given in some of the claims and in the first table of the specifications. For a surety, it encompasses without ceiling all of this type of stocking having a compressiveness above these measurements. The result would be to discourage a competitor, through fear of suit, to put on the market any such stocking with a plurality of ends, whatever its compression. A vast and unwarranted field is thus usurped by the patent.
 
 
 58
 This expanse of monopoly, with the in terrorem effect upon competitors already mentioned, does not "promote the Progress of Science and useful Arts." Art. I, Section 8 of the Constitution. We think the patent is violative of the purpose and plan of the Constitution and statutes, 35 U.S.C. § 100 et seq., in granting letters patent. The harm is defined and decried in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1883), Justice Bradley saying, "To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences." He goes on, "It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accounting for profits made in good faith."
 
 
 59
 As we reach the same end as did the District Judge in respect to the patent, and as we agree with his disallowance of any counsel fees, we will affirm the judgment of the District Court, with costs to be recovered by the non-patentees.
 
 
 60
 Affirmed.