SERVO CORPORATION OF AMERICA, Appellee and Cross-Appellant,

v.

GENERAL ELECTRIC COMPANY, Appellant and Cross-Appellee.

No. 9190.

United States Court of Appeals Fourth Circuit.

Argued April 15, 1964.

Decided Sept. 30, 1964.

Thomas F. Reddy, Jr., New York City (Eggleston, Holton, Butler & Glenn, B. Purnell Eggleston, Roanoke, Va., Pennie, Edmonds, Morton, Taylor & Adams, Keith E. Mullenger, Peter W. Krehbiel and Roy C. Hopgood, New York City, on brief), for appellee and cross-appellant.

Charles H. Walker, New York City (Woods, Rogers, Muse & Walker, Frank W. Rogers, Leonard G. Muse, Roanoke, Va., David W. Plant, Fish, Richardson & Neave, L. Earle Birdzell, Jr., George V. Eltgroth and Melvin M. Goldenberg, New York City, on brief), for appellant and cross-appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

Servo Corporation of America [hereinafter Servo] charges General Electric Company [hereinafter General Electric] with wilfully infringing three patents [1] relating to the use of devices known as "hot box detectors." Additionally, Servo charges General Electric with acts of unfair competition and unjust enrichment in the deliberate and wilful appropriation and copying of engineering techniques and methods developed by Servo.

In the proceedings below [2] the district court and the master found one of the patents, the '857 Shutter Patent, invalid, and Servo has not appealed from that portion of the judgment. The district court affirmed the master's findings of validity and infringement of the '309 Orientation Patent, but it reversed his finding that the patent had been wilfully infringed. The district court reversed the master's findings of validity and infringement with respect to the '575 Alarm Patent. Finally, the district court rejected the master's finding that General Electric had been guilty of unfair competition by utilizing Servo's detailed engineering data in the construction of General Electric's device. The questions of damages and attorneys' fees were reserved. Both parties appealed. We hold both the '309 Orientation Patent and the '575 Alarm Patent invalid and, therefore, not infringed. We reverse the district court's

---

1. Patent No. 2,947,857—"The Shutter Patent,"

 Patent No. 2,880,309—"The Orientation Patent" (Pelino and Gallagher, patentees —Servo, assignee),

 Patent No. 2,963,575—"The Alarm Patent" (Pelino and Remz, patentees— Servo, assignee).

2. The district court's opinion is reported at 220 F.Supp. 473 (W.D.Va. 1963).

718

judgment with respect to unfair competition and unjust enrichment.

## I

### The Pelino-Gallagher '309 Orientation Patent.

The '309 Orientation Patent does not claim to have originated the hot box detector as such, but only the position in which such a detector should be placed and the target at which it should be aimed to achieve commercially feasible results. The patent relates to an infrared railroad hot box detector system wherein temperature-measuring devices, generically referred to as pyrometers, are mounted alongside a railroad track in such a position as automatically to inspect the radiated heat from each journal box on a passing train. Electrical signals, proportioned in amplitude to the amount of infrared heat received by the hot box detector from passing journal boxes, are automatically produced by the detector and recorded instantaneously with a pen recorder on a paper chart as the train passes.[3] A heat profile comprising a series of pips is accordingly provided for each side of the passing train and is available for convenient evaluation. Thus the operating condition of any journal box on the train may be ascertained.

Though the patent in question is entitled a hot box detector, it correctly acknowledges the earlier development by others of infrared heat-sensitive apparatus capable of sensing the temperature of moving objects, including the journal boxes of railroad cars. It is elemental, of course, that any such apparatus would have to be mounted in such a position as to have an uninterrupted or "line-of-sight" view of a journal box (or any other object) whose temperature was to be observed. Further, since journal boxes on a passing train are interspersed with other heat sources (such as brake shoes, steam hose, and hot wheel rims), it was necessary to provide for the exclusion of signals emanating from these irrelevant sources. For this purpose a method of "gating" was suggested. This was accomplished by magnetic wheel trips which, when run over by the wheels of passing cars, automatically opened or closed the circuit which carried the signals from the scanning device to the recorder. These gating devices were of two types. With one, the circuit was kept open for a predetermined period of time. With the other, by placing two trips on the rail, the first opened and the second closed the circuit. Everything thus far described—the heat-sensing pyrometer, the necessity for a line-of-sight view of the target, and the gating function to cut out extraneous heat sources—were all disclosed by patents for hot box detectors issued before the patent in question.

Thus the Servo '309 patent is in no sense a basic or pioneer patent; it does not purport to have originated the hot box detector as such. Rather, it teaches the position in which such a detector should be placed and the target at which it should be aimed in order to achieve a commercially feasible permanent installation which avoided certain problems inherent in the prior art. This position necessarily was limited by consideration of the physical environment and railroad regulations restricting trackside installations. In the words of Servo's brief:

"The principal claimed invention of this patent is directed to the definition of the viewing axis orientation and the location of the trackside mounted infrared sensing detector elements in relation to passing railroad cars so as to utilize an advantageous aspect of the car bodies as a uniform background reference

3. The hot box detector derives its ability to sense the temperature of journal boxes from the use of a temperature sensitive device called a thermistor bolometer. Thermistor bolometers were invented by scientists of the American Telephone & Telegraph Company and made available for commercial use in about 1950. Both parties to this suit are licensed by the Telephone Company to make and use such bolometers.

against which the infrared heat radiated by significant portions of the journal boxes is compared."

Thus, the question for the court is whether the discovery of this position as disclosed by the claims of the patent constitutes invention. We hold that it does not.

This answer is not contingent upon resolving conflicting testimony, since the basic facts are not seriously in dispute. We simply hold that the standard of invention as applied by the master and the district court is not up to the legal standard required by the governing statute, 35 U.S.C.A. § 103.[4] See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

■ We think it clear that what Servo has done here is to ascertain the optimum conditions for the use of the hot box detector; and whether this was achieved by experiment in the field, as contended by General Electric, or by contemplation in the laboratory, as Servo contends, is immaterial. The objective was discoverable by experiment, and no new or unique combination of old ideas producing or performing a different or additional function has resulted. Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793, 798 (4 Cir. 1962). As stated by the Court of Customs and Patent Appeals: "It is well settled that a patent cannot be properly granted for the discovery of a result which would flow naturally from the teaching of the prior art." In re Adams, 284 F.2d 525, 527 (C.C.P.A. 1960); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir. 1961).

■ That Servo's scientists were not the first to conceive the idea of a hot box detector mounted below axle level or even at rail level is clearly demonstrated by the file wrapper and especially the Johannson patent. It is also true that they were not the first to conceive the idea of scanning the sides of the journal boxes at or near their tops.[5] Even if they were, the information furnished by the railroads concerning the heat characteristics of hot journal boxes would make this area an obvious target to anyone skilled in the science of pyrometers. Servo is, therefore, reduced to claiming the discovery of the critical angles at which a hot box detector placed below axle level operates most efficiently. Even if we assume that these critical angles are sufficiently disclosed by the claims of the invention, particularly claims 5 and 6, we are still left with the principle that criticality is not invention. Helene Curtis Industries v. Sales Affiliates, Inc., 233 F.2d 148, 152 (2 Cir. 1956). It is clear that that part of the detector which scans passing journal boxes did not perform any new function when placed in this particular position. It merely performed the same functions more efficiently. "Invention is more than recognition of latent qualities in prior art without any physical or objective change in that art." Zoomar, Inc. v. Paillard Products, Inc., 258 F.2d 527, 529 (2 Cir. 1958). Servo's elaborate explanation concerning the benefits of the uniform background achieved by its positioning of the scanner does not argue patentability. This is also true of its argument that the toed-in angle more particularly described in claim 6 avoids irrelevant heat sources. These are but rationalizations or explanations of particular adaptation of known and obvious principles—the inevitable result of experimentation. Similarly, while the commercial success enjoyed by Servo's detector leaves no doubt that it has produced a useful device, commercial

4. 35 U.S.C.A. § 103 provides:
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

5. The patent application was clearly misleading in this respect.

success cannot produce patentability where none existed before.[6] Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793, 800 (4 Cir. 1962). In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), Mr. Justice Jackson wrote:

"The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability."

█ The reliance of the master and the district court on the presumption of validity which attaches to an issued patent is misplaced in view of the failure of Servo's scientists to disclose the railroads' contribution to their success. While the master found that the railroads did not specifically inform Servo of the exact area on the journal box which would best serve as a target, there is no question that the railroads had conducted a great deal of experiment and knew the relative temperatures of the various surfaces of the journal box. Even a casual consideration of this information made it obvious that the top and upper sides of the boxes absorbed and radiated nearly three times as much heat from the overheated journal bearings as any other area. It need hardly be said that this being known, the choice of the upper portion of the trailing side of a journal box as preferable to the loosely connected journal box lids or any other area was obvious to anyone skilled in the art. This would explain why Servo soon withdrew from the suit claim 1, which teaches looking at any part of the box except the lid. Thus the optimum target was disclosed to Servo and was no part of its discovery.

Nor can Servo claim that it first conceived the idea of mounting the device below the level of the journal box and specifically at the level of the rails. This was proposed by McDonald about three weeks prior to the earliest asserted date of invention. It was also disclosed by the Johannson patent. While both Johannson and McDonald suggested that the device be placed between the rails, instead of outside the rails, and view vertically upward, Fattor five years before in his proposal to the Association of American Railroads Committee on the development of hot box alarm devices suggested positioning a hot box detector at rail level outside the tracks and viewing the sides of the journal boxes upwardly and parallel to the tracks. While it is true that both the master and the district court doubted that Fattor's proposals received the degree of publicity necessary to constitute prior art and while there is no evidence that Servo ever learned of them, nevertheless they constitute evidence of the obviousness of this position as one which would logically be considered for a permanent installation by anyone skilled in the art. United States Pipe and Foundry Co. v. Woodward Iron Co., 327 F.2d 242 (4 Cir.), rehearing denied, 329 F.2d 578 (4 Cir. 1964).

Consequently the track-level and parallel to the tracks view cannot be claimed as Servo's invention because it was either disclosed or obvious from the prior art. And indeed, this position was found not to be feasible, because certain conformations of the railroad cars made it necessary to aim the scanner placed in this position at an angle which caused it to see the sky between certain types of cars. It was this deficiency which inevitably led Servo to move the scanner outwardly from the rails and toe it in so that it could avoid this drawback. It is the toed-in position described in claim 6 which is the crux of Servo's patent. The so-called invention involved in the toed-in angle of claim 6 was a natural and obvi-

6. Nor do we think Servo's argument that the railroads had long sought a solution to the problem will bear analysis. In the first place, Servo did not solve the problem; it contributed a very minor step. In the second place, the possible solution did not exist until the pyrometer was developed in the 1950's. And finally, the railroads were interested in methods of prevention rather than discovery and cure of the hot journal box problem.

ous successor step to the track-level-parallel to the track position of claim 5. Thus the act of Servo in taking one of the known positions disclosed by the prior art and moving the device outwardly from the rail, so as to accommodate the geometry of the truck frames of railroad cars, was not invention; this modification was an ordinary engineering matter obvious to one skilled in the art. Having reached this conclusion, the claimed advantage that the position chosen allows the device to see only the quiescent background of the underside of the car will not render an otherwise unpatentable method patentable.

Having decided that Servo must fail for lack of invention, we do not reach the issue of infringement or the defenses of failure to disclose the best method of practicing the invention, as required by 35 U.S.C.A. § 112, or that detectors embodying the claims of the patent were by the plaintiff placed on sale, sold, and in commercial use more than a year prior to the filing of the continuations in part application on June 30, 1958, as prohibited by 35 U.S.C.A. § 102.

Considering the report of the master, which was extremely detailed and meticulous, and the opinion of the district court, we think that both were so impressed with the novelty, usefulness, and the commercial success of the application of the principle of the pyrometer to the problem of hot journal box detection that they failed to concentrate their attention on Servo's relatively minor contribution to the overall solution of the problem. When this contribution is extracted from the prior art and viewed in isolation, its obviousness is apparent. It does not rise to the statutory standard of invention.

II

The Pelino-Remz '575 Alarm Patent.

■ The purpose of this device was to receive the signals from the hot box detector, to automatically evaluate these signals, and when they so indicated, to activate an alarm device calling the dangerous condition to the attention of railroad personnel, thus obviating the necessity of maintaining constant supervision and interpretation of the recorder charts. The patent advanced the concept of double differential comparison of opposite axle-end heat signals. In order to do this it was necessary to make two electronic difference comparisons. The temperature of each end of the axle had to be subtracted from the other. If the temperature difference in either case exceeded the preset threshold temperature indicative of trouble, the alarm was activated. An additional function was performed by including in the circuit electronic means for briefly storing the separate axle-end heat signals after they had been passed through an electromagnetic gate and amplifier. This was necessary because the two ends of a given axle were sometimes skewed to such an extent that they could not be simultaneously scanned. Finally, the device contained a counting means which counted the wheels or axles which passed the device after an alarm was activated, thus enabling railroad personnel to locate the defective axle promptly.

While claims 3, 4, and 5 are apparatus claims, the basic inventive concept which is claimed for the patent is set forth in claim 20, a method claim. The patent was apparently issued because the applicants persuaded the Patent Office that they first conceived the idea (embodied in this method) of applying existing methods of comparing temperatures, storing signals, and sounding alarms to infrared hot box detection. The district court rejected the findings and conclusions of the master of patent validity.

The uncontested evidence shows that Berti, an employee of the Union Pacific Railroad, wrote Servo nearly 3 years before the invention date suggesting the application of this basic idea to pyrometer hot box detection. True, Berti suggested four scanners simultaneously examining four axles—two on each side of the car—and comparing them for an alarming differential, but Servo almost immediately proposed that the idea be applied to two journal boxes on the same side of the track. Finally Pilcher's con-

-temporaneous notes show that Servo had suggested applying the idea to opposite ends of the same axle at least six months before the collaboration of Pelino and Remz, the claimed inventors. When the field experiments disclosed that a substantial difference in normal operating temperature existed between friction type axles and roller bearing axles, it was a simple and obvious step to utilize this principle in comparing the opposite ends of the same axle in order that the differences between normal operating temperatures of the two types of bearings might not actuate the alarm on the hotter running axle when in fact no danger existed. Thus, the advance, if any, which the Pelino-Remz patent made over the prior existing art was obvious to anyone skilled in this field.

The electronic circuitry involved in the patent is a bridged circuit. To design and use a bridge circuit to compare two electronic signals was conceded by the electrical engineers who testified to be an elementary problem. The use of capacitors to store out-of-phase signals—which might emanate from journal boxes on a skewed angle—prior to comparison clearly reads on the Chubb patent issued in 1926 and others discussed in the record.

We hold that the patent is invalid for obviousness, and consequently we do not reach the question of infringement. Since 3, 4, and 5 are apparatus claims which fall far short of pioneer status, they would, in any event, be limited to the circuitry shown in the specifications. 35 U.S.C.A. § 112.

■ We think that the master was in error in the standard of invention which he applied in finding patentability in the '575 Alarm Patent. Utility is conceded, but utility is not novelty, and utility alone is not patentable. Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334 (1939).

### III

### Unjust Enrichment.

■ The master found that General Electric wilfully infringed and copied Servo's '309 patent in several respects. He concluded that the evidence was not sufficient to sustain a finding that General Electric had copied Servo's '575 patent. The district court, while rejecting the finding of wilful infringement and consequent punitive damages, also found:

"Similarly, on the question of copying, the Court is of the opinion that from Cockrell's visit to Salisbury and from the work and information flowing from Servo, G. E. gleaned or copied ideas that belonged to Servo under the '309 patent which we hold valid, and insofar as Servo has been actually damaged thereby, it is entitled to recover. But again, to the Court there is not sufficient basis to award punitive damages." 220 F. Supp. at 485.

We think the evidence overwhelmingly supports the master's finding and that the district court erred as a matter of law in rejecting the plaintiff's claim for unjust enrichment. There is ample evidence in the record to support Servo's contention that its relationship with Southern during the installation and testing of its detector at Salisbury, North Carolina, was a confidential one and that Southern understood this. The district court's error lay in its failure to give proper weight to this confidential relationship in its consideration of Servo's claim. The case is not one of an outright sale without reservations or requirements of nondisclosure. Servo's proposal, on the basis of which the installation was made, contained the following provisions:

"Servo Corporation of America has a proprietary interest in the information contained herein, and in some instances has patent rights in the systems and components described and requests that you distribute it only to those responsible people within your organization who have an official interest. Insofar as the material contained in this document is novel Servo Corporation of America retains a proprietary interest in its development and manufacture."

The Vice President of Southern in charge of this matter acknowledged that he was familiar with the terms of this proposal. The railroad's interoffice memorandum of March 12, 1955, the letter of May 20, 1955, from Servo's manufacturing agent to the railroad quoting prices for the equipment, and indeed the deposition of the Vice President himself make it clear that Southern understood that it was cooperating with Servo in experimental work. These facts clearly support the master's finding that Southern had entered into a confidential relationship with Servo and thus had a duty of nondisclosure at the time that General Electric's engineers appeared upon the scene.

It is also clear from the record that General Electric ceased its activities in the hot box detector field near the close of the year 1955. At that time its experimental department reported the infrared detection of hot journal boxes as feasible but involving some difficult problems in practical application. Not until the spring of 1958 did a manufacturing department of General Electric again take up this work. At this time Servo had installed its detector on Southern's tracks at Salisbury, North Carolina. Southern was extremely critical of the price charged by Servo and frankly sought to develop an alternate supply. While this situation existed, a group of General Electric's engineer personnel including most of those who subsequently developed its detector met with the Southern officers in Washington. On April 10, 1958, General Electric's engineers went to Salisbury, North Carolina, where they examined the Servo installation. Members of the party photographed the installation, brought back with them Southern's drawings of the installation, and examined a diagram of the installation made by Servo. From the report made the following day, it was clear that the party had gained valuable information which reflected much, if not all, of Servo's engineering development and field experimentation. There is strong evidence from Southern's files that General Electric requested Southern's permission to make the visit, and fur-

ther, General Electric's Sales Manager for the hot box detector admitted that he *likely* made the suggestion to go to Salisbury. In any event, we think it immaterial who initiated the trip.

On May 12, 1958, one of General Electric's engineers made a drawing of a detector which it proposed to build for Southern. The device contained most of the principal characteristics of the Servo device, including the so-called critical angles. Southern would not agree to share the development costs, and General Electric did not attempt to build the detector. Not until the Norfolk and Western Railway put up $25,000.00 later in that year did General Electric become seriously interested in producing a prototype device. Within an incredibly short time after this, General Electric was producing detectors embodying many of Servo's engineering features. While General Electric strenuously contends that it was capable of and did in fact develop its detector entirely independent of the information it procured from the Salisbury trip, the master has found differently, and we think the evidence clearly sufficient to support his finding. Nor are these findings overcome by General Electric's denial of guilt, a denial expressly rejected by the master.

 Courts long have recognized that where the holder of a trade secret imparts it to another in confidence and that other person then appropriates it for his own use, equitable remedies may be invoked to right the wrong. That it is not necessary that the trade secret be covered by patent was made explicit by the early and oft-quoted case of Booth v. Stutz Motor Car Co. of America, 56 F.2d 962 (7 Cir. 1932). There, one Booth disclosed in confidence to Stutz officials his plans for the design of an automobile. The company thereafter utilized these plans in producing a new car without offering recognition or remuneration to Booth. Booth brought an action for damages, alleging two causes of action: (1) patent infringement and (2) wrongful appropriation of his plans. The district court dismissed both counts. On appeal,

the Seventh Circuit affirmed dismissal of the first count, holding that Booth's reissue patent involved no patentable advance over prior art and was, therefore, invalid. The court went on to reverse the lower court's dismissal of the second count, holding that Booth had established his right to damages for the company's wrongful appropriation, and remanded the case for the assessment of damages.[7]

This court has applied the rationale of the Booth case to several cases arising in this Circuit. Chesapeake & O. Ry. v. Kaltenbach, 95 F.2d 801 (4 Cir. 1938); Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4 Cir. 1935), cert. denied, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936). Both involved claims for damages for the appropriation of commercial devices, in breach of confidence, prior to the issuance of a patent. As we said in Hoeltke v. C. M. Kemp Mfg. Co., supra, 80 F.2d at 922–23:

"The general rule, of course, is that the monopoly of a patent which entitles a patentee to damages for infringement commences only when the patent is granted; but where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, *not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another.* The question was before the Circuit Court of Appeals of the Seventh Circuit in the recent case of Booth v. Stutz Motor Car Co. of America (C.C.A. 7th) 56 F.(2d) 962, and we think the decision there rendered is eminently sound and just. It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the ideas of another without liability for the wrong." (Emphasis added.)

The continuing validity of this principle was considered and reaffirmed in Saco-Lowell Shops v. Reynolds, 141 F.2d 587, 598 (4 Cir. 1944). Accord, Friedman v. Washburn Co., 145 F.2d 715, 718 (7 Cir. 1944); Picard v. United Aircraft Corp., 128 F.2d 632, 637 (2 Cir.), cert. denied, 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942). Cf. Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929); Kirschner v. West Co., 300 F.2d 133 (3 Cir. 1962); Eckert v. Braun, 155 F.2d 517 (7 Cir. 1946). See generally Annot., 170 A.L.R. 449 (1947).

Because of the confidential relationship which was betrayed here by Southern, this case is distinguishable from Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). In that case the action was grounded upon state law which gave a remedy for copying resulting in confusion as to the source of manufacture. In that case the Court held that a manufacturer whose design and mechanical patents are invalid for want of invention cannot under state unfair competition law obtain an injunction against copying its product, nor an award of damages for such copying, as such use of state law conflicts with the federal government's power to grant patents. The Court went on to hold that an

7. The basis of such damages was stated in International News Service v. Associated Press, 248 U.S. 215, 240, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918), where the Court awarded damages to the Associated Press as compensation for its rival's practice of appropriating news releases, as follows:

"Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business."

unpatented article being in the public domain may be freely copied as the federal patent law had preempted the field from state action. This case, however, is one of unjust enrichment through breach of a confidential relationship, and the remedy is derived from the court's power to award general equitable relief. In Saco-Lowell Shops v. Reynolds, supra, 141 F.2d at page 598, we held:

"[W]hether the [inventor's ideas] were covered by patent or not, he was entitled to protection against their use by one to whom he had disclosed them in the course of a confidential relationship."

General Electric contends, however, that the information was procured from Southern, not from Servo, and that it breached no confidence existing between it and Servo. We think that General Electric may not so easily insulate itself from liability. The RESTATEMENT, TORTS, § 757 (1939) provides:

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * *

"(c) he learned of the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other * * *."

We think the above rule salutary and applicable to the facts present here. General Electric was aware of the confidential relationship existing between Southern and Servo. The detector business was in its infancy—the device in question, while operating sufficiently well to make its use practical, was still the subject of discussions between the parties involving changes and improvements, and it was abundantly clear that the Southern itself was a potential customer for a great many more of the devices. General Electric and Southern were *in pari delicto,* and General Electric may not escape liability in a court of equity.

Several cases have held that a businessman who hires his rival's former employee and induces the employee to divulge the rival's trade secrets imparted in confidence may be required to respond in damages. A. O. Smith Corp. v. Petroleum Iron Works Co. of Ohio, 73 F.2d 531 (6 Cir. 1934), modified on another point, 74 F.2d 934 (6 Cir. 1935); Herold v. Herold China and Pottery Co., 257 F. 911 (6 Cir. 1919). The facts here vary; the principle remains constant. General Electric learned that which it needed to know through Southern, and both parties knew that their concerted activities were in violation of the confidence reposed in Southern by Servo. Under the circumstances the plaintiff is entitled to recover of the defendant the reasonable value of the data acquired and utilized by it in unfair competition with the plaintiff. See International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918).

Finally, Servo complains that the district court ignored the mandate of Rule 53(e) (2), FED.R.CIV.P. in failing to show that the master's findings were clearly erroneous. While the court was not careful in its language dealing with the master's report, we think that it was cognizant of the burden placed upon it by Rule 53(e) (2) with respect to the master's findings of fact. In any event, in reversing both the master and the district court on questions of law with respect to the validity of the two patents remaining in the suit, we have rendered largely academic any factual differences of opinion between the two, for we think the factual differences are minor and not relevant to our decision of the legal question. With respect to the issue of unjust enrichment, we find the district court clearly in error in rejecting the master's findings of fact, which we hold to be amply supported by the evidence.

Remanded.