**FUTURE PLASTICS, INC., Plaintiff,**

v.

**WARE SHOALS PLASTICS, INC., et al., Defendants.**

**Civ. A. No. 67-35.**

United States District Court,
D. South Carolina,
Greenwood Division.

March 31, 1972.

---

See also, 4 Cir., 407 F.2d 1042; D. C., 339 F.Supp. 1276.

Clifton T. Hunt, Jr., Greensboro, N. C., Ernest J. Howard, Greenville, S. C., for plaintiff.

Ralph Bailey, Greenville, S. C., Howard Burns, Greenwood, S. C., for defendants.

## ORDER

CHAPMAN, District Judge.

This is an action for unfair competition and was tried without a jury during December 1971. The attorneys filed post trial briefs and on March 9, 1972, the Court heard oral arguments. The matter is now ripe for decision.

Plaintiff is a North Carolina corporation with its principal place of business in Gastonia. It is a wholly owned subsidiary of Impact Plastics, Inc. and brings this action alleging that defendant Massey, a former employee of plaintiff, misappropriated to his use and the use of the other defendants certain trade secrets and confidential information of plaintiff pertaining to the manufacture of high molecular weight polyethylene. Plaintiff also alleges that Massey, while employed by plaintiff, took certain equipment and material from plaintiff and is now using the equipment, material, confidential information and trade secrets in competition with plaintiff. The complaint asks substantial monetary damages and an injunction against the defendants.

The answer and counterclaim allege that plaintiff was not possessed of trade secrets or confidential information since the apparatus, equipment and processes used by the plaintiff in the manufacture of high molecular weight polyethylene (hereafter called HMWP) are old and were known in the business at the times mentioned in the complaint; that any secrets have been lost by failure of plaintiff to protect them; and, that defendant Massey had twice refused to sign covenants not to compete and trade secret agreements submitted to him by plaintiff and was under no duty to maintain secrecy. The counterclaim asserts that plaintiff brought this action for the sole purpose of embarrassing, harassing and eliminating defendants as competitors; that agents of the plaintiff have slandered defendant Massey by falsely accusing him of stealing certain material and parts; and prays for damages.

After careful consideration of all evidence, the briefs and oral arguments of counsel, the Court makes the following

## FINDINGS OF FACT

1. Future Plastics, Inc. is a North Carolina corporation, having a plant in Gastonia, North Carolina, engaged in the manufacture of high molecular weight polyethylene plastic. It is now a wholly owned subsidiary of Impact Plastics, Inc.

2. Defendant, Ware Shoals Plastics, Inc. is a South Carolina corporation, located on Route 1, Ware Shoals, South Carolina.

3. That defendants George W. Massey, W. B. Sprouse, Sr. and D. K. Lee, Jr. are citizens of the United States and residents of Greenwood County, South Carolina. Defendant Massey is the former president of Ware Shoals Plastics and defendants Sprouse and Lee are officers and employees of that corporation.

4. In 1959 Coyt E. Murray was employed as a loom fixer by Reeves Brothers (a textile manufacturer) and in his spare time began to experiment with HMWP. At this time he felt that loom parts made from this plastic would last longer than the leather parts, then in use, because of the unusual physical properties of HMWP, particularly its toughness, flexibility, resilience, abrasion-resistance, impact strength and lubricity.

5. Working in his spare time and using the "Edsonian" approach of trial and error he developed a saleable product by use of a molding process. During this period Murray formed a partnership with Thomas Forrester known as Future Speciality Products.

6. In January 1960 the plaintiff corporation was chartered under the laws of North Carolina and the stock was owned 25% by Murray, 25% by Forrester and the balance by individuals then partners of Sherrill Industries, which supplies spare parts and other equipment to the textile industry. Shortly thereafter Forrester sold his stock to the remaining stockholders.

7. Plaintiff thereafter began making HMWP through a ram extrusion process and this process is the trade secret and confidential information that defendants have allegedly taken from plaintiff.

8. An exact definition of the trade secret is difficult. In argument, counsel for plaintiff stated that the trade secret was the manufacture of HMWP by ram extrusion through a barrel of more than three and a half feet while under heat and pressure. Plaintiff's expert witness testified that there were a number of trade secrets in plaintiff's ram extrusion process including: (1) the temperature profile along the barrel; (2) the geometry of the barrel; (3) the pressure profile; (4) cycle history; (5) ram clearance; (6) materials of construction; (7) treatment of material after extruded from barrel; (8) start-up procedure; (9) ancillary equipment and equipment suppliers; (10) control devices and settings on such devices; (11) tolerance of materials, both as to equipment and polymers.

9. Dr. Harold Hopfenburg, plaintiff's expert witness, mentioned above, a professor in polymer science at North Carolina State University testified that he had never seen ram extrusion of HMWP at any other place except the plants of plaintiff and defendant and that it was not taught in schools. He also said that the process was not commonly known in the fields of science, education and manufacture. He had made an inspection of the machines and equipment at the plants of both plaintiff and defendant and was of the opinion that the equipment being used by the defendant was almost identical to that of plaintiff.

10. At the time Coyt E. Murray developed plaintiff's successful extrusion process, such ram extrusion was not generally used in connection with HMWP and equipment could not be purchased for this purpose. It was necessary for the plaintiff to build the equipment necessary to do the job. However, a brochure put out by DuPont in November 1954 described ram extruders and techniques with drawings of equipment (quite similar to plaintiff's present equipment) for use with Teflon, which is a lower molecular weight polyethylene.

11. The process used by plaintiff involves the advancing and retracting of a ram for compressing the plastic powder raw material fed from a hopper by continuously forcing it into a barrel or die. The barrel is equipped with heater bands which provide a decreasing temperature toward the exit end. The heater bands are controlled by separate switches and pressure gauges are attached to the barrel at various points. The shape of the material extruded from the end of the barrel can be varied by changing the shape of the opening at the end.

12. The ram extrusion process used by plaintiff is quite similar to that mentioned in the November 1954 brochure of the DuPont Company. The plaintiff, through trial and error, developed various ram extruding devices and no two of them are the same. The barrel lengths vary from 4½ feet to 10⅓ feet. Screw extrusion was known in the industry at the time plaintiff was developing its process. This method uses a screw rather than a ram to compress the material and move it through the barrel.

13. In November 1962 defendant Massey was employed by plaintiff primarily as an electrician and maintenance man. Prior to being employed by Future, Massey had no knowledge of any manufacturing process or technique for making HMWP and was not familiar with the equipment and apparatus used by Future. His duties included maintenance of all the equipment in the plant including the ram extruders. During

his employment with Future, Massey made improvements to the controls for the electric heaters and hydraulic systems, and he assembled two extruders without the aid of detailed engineering drawings.

14. About July 1964, Massey was requested by Murray, then president of Future, to sign a contract with Future in which Massey agreed not to divulge to anyone outside of the company any information relating to processes, methods, machines, trade secrets, etc. and further agreeing not to become employed by or associated with another corporation engaged in the manufacture and/or sale of plastics within one year from the date of termination of employment with Future. After studying this contract Massey refused to sign it. No consideration was offered to him for the execution thereof. At about the same time many other employees of Future did sign such contracts.

15. On February 12, 1964, Murray and Future entered into a contract concerning any patents, techniques, devices, processes and equipment which might thereafter be developed by Murray. The purpose of this agreement is stated "as an incentive and inducement for the said Coyt E. Murray to fully employ his techniques and skill in his capacity as head of Future Plastics, Inc." It provided for ownership of patents and division of royalties, which might be developed by Murray, but the agreement is silent concerning any then existing trade secrets or confidential information and placed no duty of secrecy on any of the parties to the contract regarding confidential or trade secrets then in existence. This agreement did not grant a license to Murray or give him the right to use the trade secrets, now in dispute, at any other place or in a competing business.

16. The manufacturing operation and techniques constituting the alleged trade secrets of Future had been in existence and operation at Future since sometime in 1960.

17. In early September 1965 Coyt E. Murray, then president of Future, was instrumental in forming an organization known as "Jet Age Industries", which was incorporated as Impact Plastics, Inc. September 30, 1965, with Coyt E. Murray as president. Impact began the manufacture of HMWP using the same techniques, types of manufacturing apparatus, alleged trade secrets and confidential information as was used by Future.

18. Prior to the incorporation of Impact, Murray informed no one at Future of any dissatisfaction or of his plan to form a competing business. However, while acting as president of Future, Murray invalidated the contracts, relating to secrecy and competition, of a number of Future employees, who subsequently were employed by Impact.

19. After the formation of Impact, Murray sold his stock in Future to the remaining Future stockholders, and by agreement dated February 23, 1966, he sold his interest in patents and patent applications to Future for the sum of $25,000.00. These patents and applications did not relate to the extruders or techniques but related to various loom parts. This agreement also provided that the agreement of February 12, 1964, should be null and void. No mention is made in the 1966 agreement of any right or license of Murray or Impact to use the information, processes or alleged trade secrets developed by Murray or Future, while he was in Future's employ.

20. Prior to Murray's departure from Future, reasonable precautions were maintained to guard the secrecy of its manufacturing apparatus and process. After Murray left Future, security measures became lax. The doors separating the extrusion department from the remainder of the plant were removed; employees from other parts of the plant were allowed to freely enter the extrusion department; delivery truck drivers went into the extrusion department and prospective purchasers viewed the process and equipment.

21. After Murray left Future the business of Future suffered greatly and morale among its remaining employees began to fall. At this time defendant Massey began to consider building an extruder of his own, since he did not believe that Future could survive.

22. On September 19, 1966, Impact purchased the stock of Future from its shareholders for a price of $144,900.00. Competition from Impact, together with the loss of its president and many of its key personnel had placed Future in a precarious position and its shareholders felt it wise to sell out.

23. Under the agreement by which Impact acquired all the stock of Future, it was agreed that Future would be operated as a subsidiary corporation, maintaining separate books, records and bank accounts, that its machinery, tools and equipment would be kept in good condition and that no assets would be sold, mortgaged or encumbered without the written consent of the sellers, while any part of the purchase price was unpaid. The last installment on the purchase price is due January 1973. This agreement also restricted wages, salaries and dividends that could be paid during this period. The sellers agreed that they would not engage in the business of producing high molecular weight polyethylene plastic for a period of five years.

24. After Impact purchased the stock, Future Plastics again came under the active management of Coyt E. Murray. Shortly thereafter, Murray tendered a second employment contract to Massey, which contract contained restrictions on disclosure of trade secrets, formulas, methods, inventions, devices and machinery and also a non-competitive clause. No consideration was offered to Massey for the execution of this contract, but he was actually advised that his salary would be adjusted from $175 per week to $2.50 per hour. Massey refused to sign the proposed contract, refused to accept the salary cut and his employment was terminated.

25. The former stockholders of Future, who were bought out by Impact, are now free to go into competition against Future and Impact, since the five year covenant not to compete has expired. Those employees who left Future and joined Impact, after having their secrecy contracts and agreements not to compete voided or cancelled by action of Murray, are also free to compete and under no obligation to maintain secrecy. One such person is Earl Day, who is now operating Poly-Hi, Incorporated in Fort Wayne, Indiana, manufacturing HMWP by ram extrusion.

26. In 1965 Hercules, Inc., the major domestic supplier of the raw material for HMWP, published a brochure entitled *Hi-Fax 1900*, indicating that ram extruders are used as a method of processing HMWP and listed firms engaged in the manufacture. Allied Chemical Company in April 1963 reprinted an article in *Plastic Design & Processing* discussing the properties and methods of processing ultra-high molecular weight polyethylene, including the ram extrusion process. In 1966 *Modern Plastic Encyclopedia* also discussed ram extrusion. It is obvious that by the middle of 1966 ram extrusion was becoming well known in the industry; Impact had access to all of the information of Future regarding the process; many employees had left Future without any obligation to maintain secrecy and others had been allowed to leave and their secrecy contracts voided; the security measures at Future had become lax and any information which formerly qualified as a trade secret or confidential information had been compromised and lost. The record shows that ram extrusion is now being used by Dualite Plastics in Louisiana.

27. Prior to leaving the employ of Future, defendant Massey, together with his sons-in-law, defendants Lee and Sprouse, created the defendant corporation Ware Shoals Plastics, Inc. in July 1966. Another son-in-law of Massey, William A. Elledge, was the first president of Ware Shoals, but after this suit was commenced resigned such position

and disposed of his interest in the company, because of his employment by Sherrill Industries.

28. Defendants Sprouse and Lee knew very little about plastics and nothing about HMWP. Massey used the knowledge he had obtained while working at Future Plastics and also his general knowledge and experience obtained over his life time as an electrician and maintenance man in building an extruder for HMWP at Ware Shoals. The barrel on the original machine ruptured from pressure and a new barrel was obtained from Greenville Steel to resist the internal pressures. There was considerable trial and error experimentation in developing an operational machine at Ware Shoals.

29. The defendant Massey, who was originally vice-president of defendant Ware Shoals, is no longer associated with that company and is now operating Hartwell Plastics, which does not use a ram extruder, but merely machines HMWP into parts for looms and other machinery.

30. In January and February 1967 the plaintiff sent two representatives to Ware Shoals, South Carolina, for the purpose of investigating the activities of the defendant Ware Shoals Plastics, Inc. During the course of this investigation these representatives made certain statements to law enforcement officers and others in the Ware Shoals area, which defendants contend are slanderous and accused Massey of stealing parts or equipment or taking formulas from the plaintiff. The Court finds that several of these statements were made to law enforcement officers and are privileged. The remaining statements were not such as would be considered slanderous per se, and even if they were found to be actionable per se, no damage to defendants has been shown.

31. Defendants allege that this law suit was brought by plaintiff maliciously and for the purpose of embarrassing, harassing and damaging the defendants and that it has been unreasonably prolonged by the plaintiff in an effort to eliminate defendants as competition. The Court does not find these allegations to be true. The instigation of this law suit by the plaintiff was to serve a legitimate corporate interest and to protect what plaintiff believes are trade secrets and to prevent defendants from using information which had been obtained from plaintiff by the alleged breach of a confidential relationship. Neither side seemed to be overly interested in expediting the disposition of this law suit and the charge of unduly prolonging the matter could be leveled with equal justification at any of the parties.

32. The Court finds that neither party is entitled to recover damages from the other and that the attorney's fees incurred by the parties are simply a cost of doing business in the competitive business world in which we live. Neither side is entitled to recover attorneys fees from the other.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action under diversity of citizenship and the amount in controversy exceeds $10,000.

■■■ 2. At the time of commencing this action the plaintiff had no trade secret because it failed to take proper and reasonable steps to maintain secrecy. A permissive use by a competitor, under no obligation of secrecy, would be inconsistent with the duty to maintain secrecy. When Murray left Future and established Impact, he took the trade secrets with him and also a number of Future employees, after releasing them from their contracts of secrecy and agreements not to compete. No effort was made by Future to protect itself or its secrets from exploitation and use by Impact, and no license agreement was made with Impact or Murray covering the secrets. See J. T. Healy & Son, Inc.

v. James A. Murphy & Son, Inc., 260 N. E.2d 723 (Mass.1970) which states:

" '[O]ne may not venture on liberties with his own secret, may not lightly or voluntarily hazard its leakage or escape, and at the same time hold others to be completely obligated to observe it.' (citation omitted) As a nationally known member of the patent bar has written, one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it."

3. Legal decisions and text books indicate that a trade secret is very hard to define. It may consist of any formula, pattern device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It is a process or device which is continually used in the operation of the business and thereby differs from secret information which may refer only to an isolated transaction. Milgrim on Trade Secrets, 1968, § 2.01.

4. Plaintiff erroneously contends that Future Plastics was a joint venture of Murray, the inventor, and the partners of Sherrill Industries. The evidence does not establish joint venture, since the parties incorporated their effort as Future Plastics, Inc. prior to the use and development of the ram extruder. A corporation is inconsistent with a joint venture. In joint venture the participants owe one another a fiduciary duty with respect to matters related to the joint venture. This rule applies to trade secrets and *Milgrim* indicates that upon dissolution of the joint venture the possibilities of co-ownership of the trade secret arises. Section 5.03(7). Plaintiff contends that if this enterprise qualifies the joint venture, then Murray had the right to take the secrets and confidential information with him in founding Impact. The form and activities of Future do not support a finding of joint venture. 48 C.J.S. § 1, page 801 defines a joint venture:

"A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge."

In the present case the individuals formed a corporation, obtained a broad form charter, and engaged in businesses other than ram extrusion of plastic.

5. The trade secrets and confidential information formed under such a corporate structure belonged to the corporation and not to the individuals, be they inventors, officers, stockholders, directors or employees. Under these circumstances Murray had no more legal right to use these secrets against the corporation than did anyone else. The agreement between Murray and Future of February 12, 1964 did not convey such right to him. He did not receive a right or license to this information under the agreement of February 23, 1966.

6. Although the law recognizes the practical need of the developer to communicate with certain employees the details of the trade secret, since they are involved in its use (see Restatement of Torts § 757, Comment b) this Court can find no exception to the secrecy requirement that would permit Murray to bind certain of Future's employees to secrecy, while leaving himself and other key employees free to compete and use the information against Future. How can Future justify its failure to protect itself from Murray and Impact in the use of its secrets? There is no exception which allows permissive competitive use, except under pledge of secrecy, and no such pledge was obtained from Murray,

**1384**

Impact or the employees who left Future at that time. There has been no showing that Future and Impact may have intended to preserve secrecy just among themselves while operating in competition.

7. Confidential relationship is the keystone of a trade secret action. Houser v. Snap-On Tools Corp., 202 F. Supp. 181 (D.Md.1962). The relationship of employer-employee is not by itself sufficient to create a confidential relationship. There must be an express understanding as to the confidential nature of the information or the circumstances must be such that the employee is aware of the confidence placed in him by the employer. National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Missouri Sup. Ct.1966). Massey refused to sign two secrecy and non-competitive agreements submitted to him. His employer was aware of the fact that he had refused to sign these agreements giving as a reason his belief that the plastics business was growing and expanding so fast he did not wish to restrict himself. The circumstances of Massey's employment were not sufficient to make him aware of any special confidence reposed in him. He was hired as an electrician to maintain all of the equipment at plaintiff's plant. Even if the court believed Murray's testimony as to Massey's oral pledge of secrecy, the circumstances drastically changed with Murray's leaving and going into competition with plaintiff, and the discontinuance of secrecy precautions at Future after that time.

8. An employee after leaving the service of his employer may carry on the same business and use for his own benefit the things he has learned in his prior employment. Prior to leaving such employment he may make plans for his new enterprise, so long as he does not use his employer's time or trade secrets in so doing. Midland-Ross Corp. v. Yokana (3rd Cir. 1961) 293 F.2d 411. The evidence here conclusively shows that Massey did not use his employer's time in creating Ware Shoals, but

worked on weekends and other free time. Also, when Massey began to build an extruder for Ware Shoals, this no longer qualified as a trade secret of Future.

9. Future is seeking equitable relief in this action, and it is elementary that he who seeks equity must do equity, and he must come into court with clean hands. Certainly it would not be just for Future to enjoin the present defendants, when it allowed Murray and Impact to do the same acts, and with such obvious success that Future was required to sell out to them. Future is the wholly owned subsidiary of Impact, and except for the sales agreement of 1966, which requires it to be kept as a separate corporation until the full purchase price has been paid, it would probably have already been merged into and become an integral part of Impact. Therefore, it is proper to consider this as an action not only by Future but also by Impact. Should Impact through its ownership of Future be allowed to enjoin the defendants from committing the same acts of which it has been guilty? Impact was conceived in the same sin of which it now accuses the defendants. The plaintiff is not entitled to damages or injunctive relief and its complaint must be dismissed.

10. The defendants have not been slandered or damaged by any statements made by plaintiff's representatives and plaintiff's suit has been found to have been brought for a legitimate purpose and not for the purpose of embarrassing, harassing or damaging defendants and defendants' counterclaim is therefore dismissed.

It is, therefore, ordered that the complaint in this action be and the same is hereby dismissed, and the counterclaim of defendants is hereby dismissed.

It is further ordered that each of the parties shall pay its own attorney's fees and legal expenses and that the court costs of this action shall be divided equally between the plaintiff and the defendant.

And it is so ordered.