Robert E. **WILKES** and Employee Services, Inc., a corporation, Plaintiffs,

v.

**PIONEER AMERICAN INSURANCE COMPANY OF FORT WORTH, TEXAS, a corporation, Defendant.**

**Civ. A. No. 73–478.**

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 28, 1974.

C. Robert Faucette, Columbia, S.C., D. Kenneth Baker, Darlington, S.C., for plaintiffs.

H. Simmons Tate, Jr., Charles W. Knowlton, Columbia, S.C., for defendant.

## ORDER

HEMPHILL, District Judge.

Plaintiffs, claiming the conception, formulation and development of a trade secret (a method of marketing), allegedly developed by him in the early 1970s at their own expense, seeks an injunction against the defendant both permanently and *pendente lite*. The Complaint was filed April 25, 1973, and on April 30, 1973, upon exhibition of the Complaint, and the motion for a preliminary injunction, (under Rule 65, Federal Rules of Civil Procedure) which was duly supported by an affidavit of the plaintiff, this court issued its Rule to Show Cause against the defendant, ordering defendant to appear and show cause before this court on the 29th day of May, 1973, at 10:30 o'clock a. m. at Columbia, South Carolina, as to why the court should not preliminarily enjoin the defendant from (a) direct or in-

direct disclosure of plaintiffs' plan and concept to persons not authorized by plaintiffs to receive such information; (b) directly or indirectly appropriating and using plaintiffs' trade secrets for its own use and benefit without approval of the plaintiffs; (c) directly or indirectly continuing to induce, persuade and entice persons and corporations to break their contract with plaintiffs; and (d) failing to protect the secrecy of plaintiffs' plan and concept. Basically, plaintiffs set forth the claim that Wilkes personally developed a trade secret, and thereafter, having disclosed it to the defendant, entered into an agreement with defendant by and between the plaintiffs and defendant, wherein defendant was to use the marketing concept; plaintiffs were to act as general agents of Pioneer American; and the plaintiffs' compensation was to be on a commission basis, deducted from commissions of individual agents using the plan under the auspices of the defendant. Plaintiffs claim that defendant violated the confidentiality agreement, claims fraud as a second cause of action, and claims unfair competition in the third cause of action. Plaintiffs demand as relief temporary and permanent injunctions, an accounting, and actual and punitive damages.

The hearing on the temporary injunction was commenced on May 29, 1973, and recessed at 6:01 p. m. on said date to reconvene at 10:30 a. m. on June 1st for arguments. Arguments were duly presented, and this court has reviewed the testimony of the witnesses, affidavits, the various exhibits, briefs, and the arguments of counsel.

Plaintiffs argue duality, but in fact are one. Wilkes is the sole owner of Employee Services, Inc. (hereinafter called ESI) using the corporation as a business entity to own, and negotiate concerning, his alleged trade secret. Plaintiffs' claim to ownership of a trade secret is based upon an alleged solution to the problem, (the mechanical handling) of an allotment from a federal employee to a life insurance company,

in payment of life insurance premium. It is uncontested that while the Federal Personnel Manual, subchapter 3, subsection 3–4, provides that allotments permitted to federal employees may be made for support of relatives, for savings and for payment of life insurance premiums and payment of taxes, this is in conflict with Public Law 90–365 (an Act of June 29, 1968), which, as amended, allows an allotment only in favor of "a financial institution." It appears that an insurance company is not defined by the statute as a "financial institution," such being defined as "any bank, savings bank, savings and loan association." Plaintiffs claim that in the face of this contradiction, prior to his discovery and conception and formalizing of his trade secret, insurance companies, and their agents in particular, were at a loss to sell life insurance, which would be paid for by allotments made by federal employees from their salaries. Wilkes testified that after considerable research, expense, time and effort on his part, and the assistance of counsel he concluded that allowing payment of the premiums by allotment was legal, and that he thereafter devised the program and prepared the necessary forms, with assistance of counsel, to overcome the contradiction between the Federal Personnel Manual and Public Law 90. He candidly stated that what he did was to use existing allotment procedures and forms in combination with the additional procedures and forms which he designed. It is the latter for which he claims a trade secret, and while its details have been revealed to this court it is neither necessary nor appropriate to discuss such details here.

Wilkes claims that he first tested the idea with Nolley Miles, Lee Lovell and Frank Harrelson, all employed by defendant as agents, or as general agents, and each of whom signed a nondisclosure agreement with ESI. Miles was serving in the Florence, South Carolina, area, Lovell in Virginia, and Harrelson in another part of South Carolina. All apparently had success with civil service employees, and all policies were placed with the defendant insurance company.

Wilkes testified he talked with various officers and executives of defendant and such was not denied.[1] In the latter part of 1970, defendant allegedly began to inquire as to the possibility of the use of plaintiffs' application forms and program with defendant's other agents. Wilkes testified that Fred Sibley finally called him and talked to him over the phone, as did a man by the name of Malcolm Brockman (then President and primary owner of defendant), Bob Mollenau of the agency staff, and Bernard Swindler, of the agency staff. Wilkes was invited to go to Texas, and on January 3, 1971, visited Swindler and Mollenau at the residence of Swindler in Fort Worth, where the home office of defendant is located. Swindler and Mollenau inquired as to the program and how it worked, but Wilkes would not reveal the details of the plan until they had signed a nondisclosure agreement, and both signed.[2] The next day, January 4, 1971, Wilkes attended a conference in the defendant's home office conference room at Fort Worth. Sibley, Swindler, Gremlin (who was vice president of underwriting), and Bob Mollenau were present. Prior to the conference, according to Wilkes, Sibley called Wilkes into his office and told him he had no idea as to how the formula or method operated and stated that there was no

---

1. Fred S. Sibley, who on the 25th day of May, 1973, executed an affidavit to be used in this litigation, stated in the affidavit, "I am President of Pioneer American Insurance Company" and he did not deny anything plaintiff testified to. Bernard F. Swindler, former Vice President of Pioneer American Insurance Company, swore to the facts stated in an affidavit of 25 May 1973, but did not deny any of the things that plaintiff testified to about their meetings. In fact he did not have anything in the affidavit which would have any bearing on the negotiations.

2. These agreements were introduced as plaintiffs' exhibits No. 2a and 2b at the hearing of May 29th.

need to have a conference unless Wilkes could fill in some of the missing links. He discussed handling it on a strictly confidential basis. Wilkes said it must be confidential, and insisted that all who participated sign a noncompetitive, non-disclosure agreement. The meeting was had, and Wilkes claims that minutes were made of the meeting[3] by Lila Graigery, the agency's secretary. Subsequently a general agency contract was signed by Wilkes, and plaintiffs' exhibit No. 3 was allegedly attached to that general agency contract. This was agreed to on January 19, 1971, and it is conceded there was no other agreement in writing between the company and plaintiffs.

Thereafter the company and the plaintiffs consumated the agreement, and operated from January 4th until the latter part of 1972 when defendant cancelled the general agency contract of Wilkes. Sibley had allegedly told some of the staff that it was not necessary to sign the agreement as he accepted the responsibilities; Sibley was running the company.

The mechanics of the operation were that the premiums were paid and forwarded to the defendant at the home office in Forth Worth. Initially eighty-nine (89%) percent of the premium went to the writing agent and eleven (11%) percent went back to plaintiff corporation. This was later modified with a new contract providing for proportions of eighty-eight (88%) percent and twelve (12%) percent respectively. The first agencies of the company to employ the new method were the agencies in Houston, Texas, and San Antonio, Texas. Wilkes insisted that anybody under the program who he had anything to do with sign the agreement. When asked about the impact of the new method, Wilkes explained that a mass market between three and three and one-half million civil service employees, and an estimated fifteen (15) to eighteen (18) million blood relatives was opened up by the plan. The advantages

of the deduction program were stated to be:

(1) It was easier for the salesmen to sell the insurance.

(2) This kind of business will stay on the books longer as it is handled by an allotment and the person does not really "miss" the payments.

Plaintiff introduced as Exhibit No. 6 a form, concededly the key to the plan, which he said he designed with the assistance of his counsel. He testified that at first he had trouble with this form and they had to make two or three trips to Washington. He reiterated that prior to this conception on his part, no insurance was written, on a direct allotment basis, on government employees. In 1971, ESI realized about $4,000.00 from the commissions and in 1972 realized about $20,000.00. Wilkes estimated that about the latter part of 1971 or the early part of 1972 the total premium intake of defendant by using his method was $70,-000.00 to $100,000.00 per month.

Wilkes testified that it was a combination of using Exhibit No. 6 and Government No. 1198 which effectively produced the business. Of course, this was no secret to the Treasury Department, and Wilkes had given to the Treasury Department (a Mr. Ruddick in the Retirement System Branch) and the postal inspector a copy of Exhibit No. 6 and Government Form No. 1198.

In 1972 plaintiffs sold their marketing program to another insurance company, American Defender Life. Since then, or perhaps somewhat later, other companies have been using similar marketing processes, including World Service Insurance Company of Forth Worth, Gulf Atlantic Insurance Company in California, the Globe Insurance Company, and Vulcan out of Birmingham. Wilkes testified that other companies got their information through defendant's manpower and people connected with the defendant. He said that he disclosed the plan to American Defender Life at the request of a number

---

3. This summation was introduced as plaintiffs' exhibit No. 3.

of people (presumably agents) who requested that he (Wilkes) find another carrier because of underwriting problems existing within the framework of defendant's organization. In addition, defendant allegedly intended to increase premiums.

Franklin T. Harrelson, West Columbia, South Carolina, another witness, formerly associated with ESI, was one of the signers of the original agreement. He was formerly with defendant corporation and signed the original agreement in August of 1970. He testified that defendant had no such program at that time, that he knew of no other such program on government employees in the insurance business as it existed at that time.

In 1973, Harrelson was invited to defendant's offices in Fort Worth. He talked with a Mr. Don Keenan, Vice President in charge of agency development, who was aware of the agreements with plaintiffs. In fact, Keenan discussed the agreements with Harrelson. Keenan commented that Harrelson did not have to honor the agreement and if he would not honor the agreement that defendant would pay the full commissions directly to him.

Defendant introduced the affidavit of Bernard F. Swindler, who said among other things:

Since May, 1972, I have been an active agent for World Service Life Insurance Company, P. O. Box 1876, Fort Worth, Texas, 76102. My primary activities with that company have been to sell and service 'life insurance to and for federal employees under a salary deduction insurance program. This program involves the sale of life insurance to federal employees giving them the benefit of insuring their wives and families, with the federal government providing the service of automatic deductions of premiums from their salaries. To my personal knowledge this type of insurance is being sold and marketed by several insurance companies through-

out the United States, other than World Service Life Insurance Company and Pioneer American Insurance Company.

■ Pertinent to any decision on the question here raised is a determination of just what is encompassed by the term "trade secret." As defined by the American Law Institute, Restatement of Torts § 757 comment b, p. 5:

A trade secret may consist of any formula, pattern, device, *or compilation of information which is used in one's business,* and which gives him an opportunity to obtain an advantage over competitors who do not know to use it. * * * It differs from other secret information of business in that it is simply not information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees. . . . A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. *It may, however, relate to the sale of goods or to other operations in the business,* such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management. [emphasis added.]

This definition was specifically adopted in the recent case of Clark v. Bunker, 453 F.2d 1006, 1009 (9th Cir. 1972), a case in many respects similar to the present case. In *Clark,* plaintiff devised forms, advertising methods, and sales techniques for selling "prepaid" funeral services which he claimed were a trade secret. The forms and plans consisted of a combination of many commonly used practices, but were combined in a way that had not been used before, and gave plaintiff a marked advantage over competitors. The court held with-

out qualification that a trade secret existed, and that plaintiff was entitled to damages when his trade secret was breached. The court relied heavily on the fact that plaintiff, through his labor, time and efforts, had devised a plan using materials which, although available to his competitors, had never been so formulated and used. As was noted by the Fourth Circuit in Servo Corporation of America v. General Electric Co., 393 F.2d 551 (1968), the first determination which must be made in a trade secret case is whether, in fact, there was a trade secret to be misappropriated. It appears to this court that the conception, formulation, and development of the method of marketing life insurance to civil service employees claimed by the plaintiff falls squarely within the description of a trade secret in the Restatement of Torts § 757 quoted above, particularly in light of *Clark,* supra.

■ Defendant contends that even if plaintiff's marketing method can be considered to be a trade secret, by its very nature the marketing method necessitates such public disclosure that any confidentiality is destroyed. Defendant further contends that plaintiff's method was merely a compilation of material which was public knowledge even prior to its disclosure to customers in the sales process. This latter contention will be considered next. This point is somewhat similar to the initial question of whether there was in fact a trade secret to protect. It is well settled law that the fact that part, or even eventually all, of the components of a trade secret are matters of public law or public knowledge does not prohibit a claim of trade secret. In Imperial Chemical Industries v. National Distillers, 342 F.2d 737 (2d Cir. 1965) the court held that:

> * * * A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret. *Id.* at 742.

As was so cogently stated in A. O. Smith Corporation v. Petroleum Iron Works Co., 73 F.2d 531, 538 (6th Cir. 1934):

> The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons. Hundreds pass them by, till one more observant than the rest makes discovery. *Id.* at 539.

More recently, the Fourth Circuit in *Servo Corporation,* supra, observed that piecing together, in retrospect, bits of information which had been disclosed in a variety of places and which *as a combination* were not clearly matters of public knowledge will not allow avoidance of the consequences of a breach of confidence. 393 F.2d at 555.

■■ Turning next to the question of whether confidentiality has been destroyed, it should first be noted that while a trade secret is clearly a property right, protected from unauthorized use or disclosure, Saco-Lowell Shops v. Reynolds, 141 F.2d 587 (4th Cir. 1944), it is the breach of confidence by unauthorized disclosure, rather than the infringement of a property right, which is the gravaman of trade secret cases. Servo Corporation, supra, 393 F.2d at 555. The complete public disclosure of a trade secret admittedly destroys the legal effectiveness of, or prevents the creation of, any confidential relationship based upon the secret, the breach of which is the very essence of a trade secret's action. However, the disclosure must be such as to make the "secret" so obvious as to render meaningless the confidential relationship. *Id.*

██ Defendant here contends that the disclosures of the plans to certain government officials acting in their official capacity, the disclosures to the financial institutions involved in the execution of the plan, and the necessary disclosure of the forms used in the plan to customers using the plan (necessitated by the fact that the customer had to sign certain forms), constitutes such public disclosure as to destroy any secrecy surrounding the plan. The court cannot agree with this contention. As to the first two groups—certain government officials and officials of financial institutions—it is clear that plaintiffs had and have the right to rely on at least a limited degree of confidentiality, inherent in dealings with such officials, to prevent their disclosing information, conveyed to them in confidence, to the public at large. As to the customers to whom certain forms were necessarily disclosed, it appears from the record that the forms were not retained by them to be passed on to others and the forms were not given to them for signing prior to the time they signed the application necessary to obtain the life insurance from agents (authorized to institute the plan only after signing nondisclosure agreements). It is also clear at this point in the record that at no time did the plaintiffs make or allow disclosure of the plan to insurance agents or companies without first obtaining nondisclosure agreements from them. Such limited disclosures as these do not comport with the "complete public disclosure" which would destroy the secrecy envisioned here. As was held by the court in *Bunker,* supra:

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Id.* at 5–6. *However, the interest protected by this branch of the law is not secrecy as such. "The protection is merely against breach of faith and reprehensible means of learning another's secret." Id.* at 7. Accordingly, *"a sub-*

*stantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information." Id.* at 6.

*Whether such a degree of secrecy existed in a particular case.is a question of fact.* It is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public. Obviously *it may be present despite the publication of general descriptions in advertisements, sales brochures, and similar material; or by sales where the details are not readily apparent from inspection of what is sold, or the purchasers do not disclose those details.* 453 F.2d at 1009 (quotations from Restatement of Torts § 757 Comment b.) (citations omitted, emphasis added).

It is noteworthy that the court was here commenting on contentions that the plan in question was not secret because the appellee:

. . . had authorized seven other corporations to use it; he had discussed it with the managing director of a national association of morticians; the plan was described in a trade publication issued by this association; the files of another such association contained some forms used in the plan; and some of the forms used were necessarily disclosed to the members of the public who purchased 'pre-need' funerals. *Id.*

Defendant finally insists that the injunctive relief sought by the plaintiff is neither necessary or appropriate, and cite Consolidation Coal Co. v. Disabled Miners of S. W.Va., 442 F.2d 1261 (4 Cir. 1971) for the proposition that in order to be entitled to the extraordinary writ of injunction, plaintiff(s) must show a reasonable likelihood that he will prevail on the merits of the litigation, and that his need for protection, when considered together with the public interest, outweighs the probable injury to the defendant. Defendant further positions that even assuming that plaintiffs make the requisite showing, en-

joining defendant from using or disclosing the plan would be of little use to plaintiffs as a number of other insurance companies presently use "plaintiff's marketing concept."

As to the first of these contentions, there is no dispute. But where it appears to the court that plaintiffs have indeed carried their burden of showing a reasonable likelihood of prevailing on the merits, as is apparent from the foregoing discussion, plaintiffs are entitled to the relief sought.

With regard to defendant's second contention on this point, it appears that defendant relies primarily on its assertion that no express nondisclosure agreement was entered into between plaintiffs and defendant. Defendant does not, and cannot, deny however that such agreements were in fact entered into with the major officials of the company before he would agree to disclose the key elements of the plan to them. Defendant urges upon the court in support of its position the case of Bristol v. Equitable Life Assurance Society of United States, 132 N.Y. 264, 30 N.E. 506 (1892). This 1892 decision held that a formal contract was necessary to guard against disclosure of a trade secret. This court however cannot accept Bristol as controlling law in this case in light of such cases as Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912 (7th Cir. 1953), and Colgate-Palmolive Co. v. Carter Products, 230 F.2d 855 (4th Cir. 1956), cert. den. 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59. In the *Ferroline* case, the court, applying New Jersey law, concluded that:

> The protection afforded * * * [trade secrets] extends against third persons who, knowing of the employee's obligation, may profit from his disclosure. * * * A stranger and its employees may be enjoined where, with knowledge of the employee's covenant and in violation thereof, the stranger applies to his own use the property of the complainant. 207 F. 2d at 921 (citations omitted).

Closer to home is the *Colgate-Palmolive* case which arose in the District of Maryland. The court there cited with approval Restatement of Torts § 757 as setting forth the well settled principle of law that:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
>
> *      *      *      *      *      *
>
> "(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, * * *." *Id.*, 230 F.2d at 864–865

and went on to cite numerous cases directly supporting this proposition. The court further quoted with approval the following from Herold v. Herold China & Pottery Co., 257 F. 911 (6th Cir. 1919):

> The rule is well settled that secret formulas and processes, such as are claimed to be involved here, are property rights which will be protected by injunction, not only as against those who attempt to disclose or use them in violation of confidential relations or contracts express or implied, but as against those who are participating in such attempt with knowledge of such confidential relations or contract, though they might in time have reached the same result by their own independent experiments or efforts. 230 F.2d at 865.

Defendant's reliance on the recent case of Future Plastics, Inc. v. Ware Shoals Plastics, Inc., 340 F.Supp. 1376 (D.S.C. 1972) as further support for his insistence that there must be a showing of an *express agreement* by defendant not to disclose the trade secret is misplaced. While this indeed was a part of Judge Chapman's holding, defendant ignores the remainder of the sentence on which he relies. The full sentence reads, "There must be an express understanding as to the confidential nature

of the information *or the circumstances must be such that the employee is aware of the confidence placed in him by the employer.* *Id.* at 1384. Additionally, in *Future Plastics* the defendant *refused to sign two* secrecy and non-competitive agreements; the court found in addition that the plaintiff (1) had not taken necessary steps to maintain secrecy; and (2) did not itself have "clean hands" as it had failed to take any steps to prevent certain others from using the process for which a trade secret was claimed.

From the record in this case it is inconceivable that defendant could not have had knowledge of the confidential nature of plaintiffs' plan, and defendant in fact admits knowledge, choosing to rely solely on its assertion that there was no express agreement as to non-disclosure. This latter point plaintiffs vigorously contest, but that question need not be answered here and may await a decision on the merits of this case.

There was no showing that the relief sought by plaintiffs will in any way be a hardship on the defendant and will preserve the status quo until this matter is finally resolved by the court.

Plaintiffs' petition for a temporary injunction against defendant should be granted. The defendant is hereby enjoined from the following conduct:

(a) Directly or indirectly through its employees or agents making disclosures of plaintiffs' alleged plan and concept to any persons without requiring them to sign the nondisclosure agreement previously used in connection with plaintiffs' alleged plan:

(b) Directly or indirectly persuading, enticing, or encouraging any persons or corporations to break their existing contracts and/or agreements with plaintiffs;

(c) Failing to protect the secrecy of plaintiffs' alleged plan or concept from further disclosure by its officers, employees, or agents by action or inaction on their part.

And It Is So Ordered.