**BBA NONWOVENS SIMPSONVILLE, INC., Reemay, Inc., and Fiberweb France SA, Plaintiffs–Cross Appellants,**

v.

**SUPERIOR NONWOVENS, LLC and Lloyd E. Trimble, Defendants–Appellants.**

Nos. 02–1053, 02–1059 and 02–1101.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 30, 2002.

Rehearing Denied Oct. 7, 2002.

**1334**

William M. Atkinson, Alston & Bird, LLP, of Charlotte, North Carolina, argued for plaintiffs-cross appellants. With him on the brief were John P. Higgins and Kirk T. Bradley.

H. Sam Mabry, II, Haynsworth Sinkler Boyd, P.A., of Greenville, South Carolina, argued for defendants-appellants. With him on the brief were W. David Conner and Kevin A. Kauer. Of counsel on the brief were Albert L. Underhill and James D. Withers, Merchant & Gould, P.C., of Minneapolis, MN.

Before NEWMAN, LINN, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge LINN. Dissenting opinion filed by Circuit Judge DYK.

LINN, Circuit Judge.

 Superior Nonwovens, LLC and Lloyd E. Trimble ("Superior") appeal the decision of the district court denying Superior's post-trial motions for judgment as a matter of law ("JMOL") and for a new trial. The district court's judgment followed a jury verdict in favor of Fiberweb France SA ("Fiberweb France") on its trade secret claim and in favor of BBA Nonwovens Simpsonville, Inc. ("BBA") on its patent infringement claim. Superior further appeals the district court's order permanently enjoining Superior from using, selling, or otherwise disclosing the trade secrets of Fiberweb France. Reemay, Inc. ("Reemay") cross-appeals the district court's order denying Reemay's motion for a new trial. Fiberweb France seeks modification of the district court's order that 10 percent of Superior's net sales be placed in escrow pending appeal. Because the district court did not err in denying Superior's motions for JMOL and a new trial, and because the district court

did not abuse its discretion in declining to instruct the jury on the *Servo* case or in forming the escrow order, we affirm[1].

## BACKGROUND

BBA, Fiberweb France, Reemay, and Superior are commercial manufacturers of spunbond nonwoven fabrics used in the production of other products, such as dryer sheets, filters, and carpet underlay. BBA, formerly known as Fiberweb North America, is affiliated with Fiberweb France and Reemay, as all three companies are owned by BBA Group PLC (a UK corporation).

Superior was formed in early 1998 by several former employees and consultants of Fiberweb France, BBA and Reemay. These former employees include President Lloyd E. Trimble and Vice–President Scott Gessner. Superior's goal was to produce nonwoven fabric in competition with Fiberweb France, BBA, and Reemay.

The technology at issue relates to the manufacture of spunbond nonwoven fabric. The manufacturing process begins with polymer pellets that are melted and extruded through a spinneret to form long discrete polymer filaments. The filaments are cooled with air from "quench chambers," stretched to provide strength, electrostatically charged so the filaments don't bunch together, and deposited onto a moving "laydown belt" to form a nonwoven web of fabric. The web is then bonded, sometimes using a consolidator, and wound for later conversion into end products.

Three distinct disputes, relating to three distinct technologies used in the manufacturing process, are at issue in this appeal. First, Fiberweb France asserted that Superior willfully·misappropriated its trade secret quench chamber technology. Second, BBA asserted that Superior willfully infringed its U.S. Patent No. 5,397,413 ("the '413 patent") directed to an apparatus and method for producing a web of thermoplastic filaments, including claims reciting a slot-draw attenuator with a corona device positioned to electrostatically charge the filaments. Third, Reemay asserted that Superior willfully misappropriated its trade secret steam consolidator technology.

BBA and Reemay brought suit against Superior in the U.S. District Court for the District of South Carolina on September 6, 2000, alleging trade secret misappropriation and patent infringement. Fiberweb France was later added as a plaintiff for trade secret misappropriation. Following expedited discovery, the district court on August 9, 2001 held a *Markman* hearing, and on August 17, 2001 issued a *Markman* ruling construing claims 1, 8, 9, and 13 of BBA's '413 patent. On August 20–31, 2001, a jury trial was conducted.

The jury returned a verdict in favor of Fiberweb France on its trade secret claim, in favor of BBA on its patent infringement claim (claims 1, 8, 9, and 13), but against

---

1. The parties have submitted a "Motion Requesting Issuance of Any Written Opinion Under Seal or Without Disclosure of Confidential Information." The motion requesting issuance of this opinion under seal is denied. "Official records and documents open to the public are the basic data of governmental operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Thus, "the beneficial effects of public scrutiny upon the administration of justice" support a presumption in favor of public access to judicial records. *See id.; Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 602, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). However, the court has avoided the inclusion in this opinion of any information marked confidential by the parties.

Reemay on its trade secret claim. The jury found that Superior's misappropriation of Fiberweb France's trade secrets was "willful, wanton, or reckless" and awarded actual damages of $2,620,275.00. The jury further found that Superior's infringement of BBA's '413 patent was willful and awarded actual damages of $50,000.

On November 1, 2001, the district court denied Superior's motions for JMOL or a new trial, and awarded, in addition to the actual damages found by the jury, punitive damages of $1,310,137.50 on Fiberweb France's trade secret claim, and enhanced damages of $50,000 on BBA's patent infringement claim. The district court also permanently enjoined Superior from using or otherwise disclosing Fiberweb France's trade secrets and from using the electrostatic apparatus of BBA's '413 patent. On motion of Superior, the district court stayed the injunction as to Fiberweb France's trade secret and imposed a royalty escrow procedure in which 10 percent of Superior's net sales were placed in escrow pending appeal. Superior did not oppose imposition of the injunction as to the '413 patent during appeal.

We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1295(a)(1), where a patent infringement claim was raised for the first time in the complaint, *see Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, —— U.S. ——, ——, 122 S.Ct. 1889, 1893, 153 L.Ed.2d 13 (2002), including pendent jurisdiction of the claims for trade secret misappropriation, *see Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1116, 37 USPQ2d 1816, 1819 (Fed. Cir.1996) (citing *Rhone–Poulenc Specialites Chimiques v. SCM Corp.*, 769 F.2d 1569, 1571, 226 USPQ 873, 874 (Fed.Cir. 1985)).

## DISCUSSION

### Standard of Review

■ The denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, and thus we apply the law of the regional circuit where the appeal from the district court would normally lie. *See Sjolund v. Musland*, 847 F.2d 1573, 1576, 6 USPQ2d 2020, 2023 (Fed.Cir.1988). In this case, that is the Fourth Circuit. The Fourth Circuit reviews de novo a district court's denial of a motion for judgment as a matter of law. *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 532 (4th Cir.2002) (citing *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir.1999)). According to the Fourth Circuit, a motion for judgment as a matter of law should be granted if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings. *See White v. County of Newberry*, 985 F.2d 168, 172 (4th Cir.1993).

■ The denial of a motion for a new trial likewise is a procedural issue not unique to patent law. Thus, we apply the law of the regional circuit to the Rule 50(b) issue as we do with the JMOL issue. *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1290, 56 USPQ2d 1161, 1168 (Fed.Cir.2000). In reviewing a district court's decision on a Rule 50(b) motion, Fourth Circuit law instructs that we must "view all the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in his or her favor." *S. Atl.*, 284 F.3d at 532. The Fourth Circuit reviews a denial of a motion for a new trial under Rule 50(b) for abuse of discretion. *See Konkel*, 165 F.3d at 279; *Bristol Steel & Iron Works, Inc. v. Bethle-*

*hem Steel Corp.*, 41 F.3d 182, 186 (4th Cir.1994).

■ Federal courts apply the trade secret law of the appropriate state. *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 670, 7 USPQ2d 1097, 1105 (Fed.Cir. 1988). In the case at bar, the defendants-appellants have a principal place of business and/or reside in South Carolina, and all acts of alleged trade secret misappropriation occurred in South Carolina, thus we apply the trade secret law of the State of South Carolina. *See Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1561, 227 USPQ 81, 83 (Fed.Cir. 1985).

■ Claim interpretation raises issues of law that this court reviews de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed. Cir.1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

### I. Superior's Appeals

Superior appeals the district court's decisions denying Superior's motions for JMOL or for a new trial with regard to Fiberweb France's claim of willful, wanton, or reckless misappropriation of trade secrets, and to BBA's claim of willful infringement of the '413 patent. We first address Fiberweb France's trade secret claim, and then discuss BBA's patent infringement claim.

### A. Fiberweb France's Trade Secret

Superior argues that Fiberweb France failed to show the existence of a trade secret under South Carolina law. Superi-

or further contends that the record lacks substantial evidence of (i) misappropriation of a trade secret by Superior, and (ii) "willful, wanton, or reckless" misappropriation by Superior, sufficient to support the jury's verdict.

### 1. Existence of Trade Secret

■ Superior argues that Fiberweb France failed to prove at trial that its trade secret technology satisfied each of the statutory requirements for existence of a trade secret under South Carolina law. In particular, Superior contends that the record lacks substantial evidence showing Fiberweb France's quench chamber technology makes a "substantial difference in the efficiency of a process or the production of a product" and that the requirements of S.C.Code Ann. § 39–8–20(5)(b) (Law.Co-op.Supp.2001) are not satisfied. According to Superior, because Fiberweb France had the burden of proving that its technology qualified as a trade secret under South Carolina law, *see Lowndes Prods., Inc. v. Brower*, 259 S.C. 322, 191 S.E.2d 761, 765, 177 USPQ 209, 211 (S.C. 1972), and because the evidence at trial showed that Fiberweb France's quench chamber technology was composed of a combination of well-known elements, then Fiberweb France was required to demonstrate "substantial difference" pursuant to § 39–8–20(5)(b).

Fiberweb France responds that this argument was not before the district court and is thus waived. On the merits, Fiberweb France argues that its trade secret technology is not in fact composed of a combination of known elements. Fiberweb France argues that substantial evidence of record establishes that each of the individual elements of its quench chamber technology qualifies for trade se-

cret protection under S.C.Code Ann. § 39–8–20(5)(a). Fiberweb France further argues that § 39–8–20(5)(b) does not impose the additional requirement, asserted by Superior, that to qualify as a trade secret, a combination of known elements must be shown to "make a substantial difference in the efficiency of a process or the production of a product." Finally, Fiberweb France argues that even if § 39–8–20(5)(b) imposes an additional "substantial difference" requirement, substantial evidence of record including testimony and documentary evidence demonstrates that its quench chamber technology satisfies this requirement.

■ As a threshold matter, we briefly address Fiberweb France's waiver argument. Although the court may decline to address issues not "fairly raised" before the trial court in the absence of plain error, *United States v. Seidlitz*, 589 F.2d 152, 160 (4th Cir.1978), the Fourth Circuit has endorsed the "liberal application of Rule 50(b)" in *Singer v. Dungan*, 45 F.3d 823, 828–29 (4th Cir.1995). *See Harrison v. Edison Bros. Apparel Stores, Inc.*, 151 F.3d 176, 179 (4th Cir.1998). Superior moved for JMOL at the close of plaintiff's case and at the close of all of the evidence, challenging the existence of a trade secret as to Fiberweb France. While Superior's argument in the district court was somewhat general, it did the raise the question of whether Fiberweb France had proven the existence of a protectable trade secret. In light of the applicable standard, we decline to find waiver of the issue of whether Fiberweb France satisfied the statutory requirements.

■ We begin our analysis with the language of the statute. "If a statute's language is plain and unambiguous, and con-

veys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation...." *Ray Bell Constr. Co. v. Sch. Dist. of Greenville County*, 331 S.C. 19, 501 S.E.2d 725, 729 (1998). But where the "plain language of the statute lends itself to two equally logical interpretations," courts "must apply the rules of statutory interpretation to resolve the ambiguity and to discover the intent of the General Assembly." *Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 549 S.E.2d 243, 247 (2001).

South Carolina statutes governing trade secrets are modeled after the Uniform Trade Secrets Act ("UTSA"). The UTSA defines the phrase "trade secret:"

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Unif. Trade Secrets Act § 1 (amended 1985). South Carolina initially adopted the UTSA, but later enacted the South Carolina Trade Secrets Act ("SCTSA"), S.C.Code Ann. §§ 39–8–10 to–130, in 1997. *See Williams v. Riedman*, 339 S.C. 251, 529 S.E.2d 28, 42 n. 3 (App.2000). The SCTSA expands the definition of trade secret by adding to the types of information that may qualify as a trade secret:

(5) "Trade secret" means:

(a) information including, but not limited to, a formula, pattern, compilation,

program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(b) A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

S.C.Code Ann. § 39–8–20(5) (Law Co-op. Supp.2001). Beyond adding to the enumeration of the types of information that may qualify as a trade secret, the SCTSA provides an open-ended definition, i.e., "including, but not limited to." *Id.*

The 1997 enactment of the SCTSA sought to expand trade secret protection and to implement other pro-business changes to the statute to make the state more attractive to businesses in the manufacturing and technology areas. *See* Philip A. Kilgore & Charles N. Griffin III, *Trade Secrets in South Carolina: New Act Changes Outlook for Employers,* 9 S. Carolina Lawyer 20, 25 (1998); Mark V. Thigpen, *A New Age of Discovery: Your Trade Secrets Are Safe In South Carolina,* 49 S.C. L.Rev. 615, 620 (1998).

Prior to the SCTSA, the protectability of combination trade secrets was governed by *Lowndes Products*, which stated:

A trade secret can exist in the unique combination of otherwise known components; although each of its parts, by itself, may be in the public domain, the unified process, design and operation of the combination may be the essence of the secret.

* * * * * *

[A]n unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by the prior art. . . .

191 S.E.2d at 764, 177 USPQ at 211 (quoting 2 Callman, *The Law of Unfair Competition, Trademarks, and Monopolies,* §§ 52.1, 53.3 (3d ed.1968)). Federal courts applying South Carolina law have been in accord. *See Wilkes v. Pioneer Am. Ins. Co.,* 383 F.Supp. 1135, 1140 (D.S.C.1974) ("It is well settled law that the fact that part, or even eventually all, of the components of a trade secret are matters of public law or public knowledge does not prohibit a claim of trade secret.") (citing *Imperial Chem. Indus. v. Nat'l Distillers,* 342 F.2d 737, 742 (2d Cir.1965) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.")).

Courts applying the law of other states have cited the common law basis for combination trade secrets, even after passage of the UTSA. *See, e.g., Capital Asset Research Corp. v. Finnegan,* 160 F.3d 683, 686, 48 USPQ2d 1853, 1855 (11th Cir.1998) (applying Georgia law); *Rivendell Forest Prods., Ltd. v. Georgia–Pacific Corp.,* 28 F.3d 1042, 1045, 31 USPQ2d 1472, 1475 (10th Cir.1994) (applying Colorado law); *Servo Corp. of Am. v. Gen. Elec. Co.,* 393 F.2d 551, 554, 157 USPQ 470, 473 (4th Cir.1968) (applying Virginia law); *BioCore, Inc. v. Khosrowshahi,* 96 F.Supp.2d 1221, 1226 (D.Kan.2000) (applying Kansas law); *Nilssen v. Motorola, Inc.,* 963 F.Supp. 664, 677 (N.D.Ill.1997) (applying Illinois law); *Enter. Leasing Co. of Phoenix v. Ehmke,* 197 Ariz. 144, 3 P.3d 1064, 1069, 55 USPQ2d 1303, 1307 (App.1999) (applying Arizona law). Many of the cases from other jurisdictions cite *Imperial* for its definition of trade secret. *See Rivendell,* 28 F.3d at 1045, 31 USPQ2d at 1475; *Nilssen,* 963 F.Supp. at 677; *Imperial,* 342 F.2d at 742. .

Superior has pointed to no provision of the statute, and we can find none, indicating that the South Carolina legislature intended to narrow the definition of a trade secret enunciated in *Lowndes Products.* Superior cites § 39–8–20(5)(b), but this provision expands, rather than narrows, protection of trade secrets. Contrary to Superior's assertions, § 39–8–20(5)(b) is not restrictive. Use of permissive language (i.e., "may consist of"), rather than mandatory language (e.g., "must"), in this provision demonstrates the intent of the South Carolina legislature to expand trade secret protection to "a simple fact, item or procedure, or a series or sequence of items or procedures" which meet certain conditions. There is no indication in this provision that the legislature intended to re-strict the definition of "trade secret" set forth in § 39–8–20(5)(a), or to narrow the definition to exclude trade secrets otherwise protectable under that definition.

Fiberweb France argues that its quench chamber technology is protectable as a trade secret under § 39–8–20(5)(a). We agree. Substantial evidence of record demonstrates that at least one of the individual elements of its quench chamber design qualifies for trade secret protection. At least one expert witness testified that the individual elements of the quench chamber technology at issue were "very novel," "really quite unusual," and "very, very unusual."

Further substantial evidence in the record supports a finding that the combination itself qualifies for protection under *Lowndes Products.* Although Superior cites various published references showing summary descriptions of similar technology, substantial evidence of record establishes that the particular combination used by Fiberweb France was not generally known or readily ascertainable by the public. We decline to find that the SCTSA narrowed the definition of "trade secret" from that existing under the common law.

Moreover, substantial evidence of record supports protection of Fiberweb France's quench chamber technology under § 39–8–20(5)(b). Documentary evidence and testimony appears in the record showing that Superior's officers considered the details of the quench chamber design to be important to production, implying that Fiberweb France's technology does make a difference in the production of the nonwoven fabric end product, and that difference is substantial. Superior cites no evidence tending to show the contrary. Under these circumstances, we decline to find a lack of substantial evidence to support the

jury's presumed finding that Fiberweb France established the existence of a trade secret. *See Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.1984) (absent interrogatories, findings necessary to support the jury verdict are presumed); *accord Tights, Inc. v. Acme–McCrary Corp.*, 541 F.2d 1047, 1061, 191 USPQ 305, 314 (4th Cir.1976).

### 2. Evidence of Misappropriation

■ Superior argues that the jury verdict of misappropriation of Fiberweb France's trade secret cannot stand for lack of substantial evidence of misappropriation. Superior argues that it became aware of the trade secret information through independent contractor Scott Gessner, who had no master-servant relationship with Superior. Superior contends that the information was passed while Scott Gessner was merely a consultant, prior to his becoming an officer of the corporation, thereby relieving Superior of any liability.

Superior further argues that no evidence was introduced that Gessner had an enforceable nondisclosure agreement with Fiberweb France. Even if one existed, according to Superior, it was nullified when Fiberweb France failed to reply to Gessner's letter requesting clarification of what information was considered secret.

Superior contends that Dr. Trimble could not have misappropriated the information because there was insufficient evidence that he knew or had reason to know that Fiberweb France considered the technology in question to be a trade secret.

"Misappropriation" is defined in the SCTSA:

(2) "Misappropriation" means:

(a) acquisition of a trade secret of another by a person by improper means;

(b) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(c) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret; or

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired by mistake or under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

S.C.Code Ann. § 39–8–20(2) (Law Co-op. Supp.2001).

Misappropriation under the SCTSA does not turn on the existence of any master-servant relationship. The definition of misappropriation includes "acquisition of a trade secret ... by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* We find Superior's master-servant argument to be irrelevant to the dispositive

issue of whether the quench chamber information was acquired by a person (i.e., Gessner or Trimble) who knew or had reason to know that it was acquired by improper means.

As for an enforceable nondisclosure agreement, the record shows that Gessner believed he was bound by a nondisclosure agreement. The record includes Gessner's letter acknowledging "Confidentiality Agreements which I signed," and requesting a clarification of what Fiberweb France considered its trade secrets, which received no response. Thus, rather than showing an absence of an enforceable nondisclosure agreement, the record instead shows substantial evidence of the existence of such an agreement. Fiberweb France's failure to reply to Gessner's letter hardly signifies an intention to rescind the agreement, and on the contrary may show Fiberweb France's intention to preserve the trade secret.

■ As for misappropriation by Trimble, the record includes substantial evidence showing that Trimble had reason to know the information was secret and had been acquired by improper means. Trimble had been employed by Fiberweb France and hence knew or should have known that Fiberweb France maintained the quench chamber technology as a secret. Trimble admitted that he had access to the information during his employment by Fiberweb. Company documents, confirmed by testimony, show that he personally directed the transfer of the information to outside contractors, for the purpose of including Fiberweb France's quench chamber technology in Superior's production facility. We find that substantial evidence supports the jury verdict of misappropriation of Fiberweb France's trade secrets.

### 3. Willful, Wanton, or Reckless

■ Superior argues that willful, wanton or reckless misappropriation requires some element of aggravation or malice. Superior contends that the evidence in this case suggests the defendants were motivated by competition and not malice or an element of aggravation. Superior argues that Gessner acted in good faith when sharing the information because he did not personally believe that the technology in question was a trade secret and asked for clarification before sharing the information.

Fiberweb France argues that the statute has a willful, wanton, or reckless standard and no aggravation or malice need be shown. We agree. S.C.Code Ann. § 39–8–40 states:

(A) A complainant is entitled to recover actual damages for misappropriation of trade secrets.

\*　　\*　　\*　　\*　　\*　　\*

(C) Upon a finding of *willful, wanton, or reckless disregard* of the plaintiff's rights, the court may award separate exemplary damages in an amount not exceeding twice any award made under subsection (A).

S.C.Code Ann. § 39–8–40 (Law Co-op. Supp.2001) (emphasis added). No malice or aggravation standard appears in this provision. Although Superior cites cases in support of a malice standard, including *Eberle v. Southern Railway,* 98 S.C. 89, 79 S.E. 793, 795 (1913), and *Cohen v. Allendale Coca–Cola Bottling Co.,* 291 S.C. 35, 351 S.E.2d 897, 900 (App.1986), those precedents do not interpret the governing statute.

Moreover, the record supports a finding of willful misappropriation. Trimble

admitted that he had access to the information and the evidence shows that he personally directed the transfer of the information to outside contractors, for the purpose of including Fiberweb France's quench chamber technology in Superior's production facility. Gessner continued to support the project when LTG Germany was tapped to help design Superior's facility, even though Gessner knew that LTG Germany was familiar with Fiberweb France's secret chamber design. Superior continued to pursue the design, even after being told by its contractor that it could not confirm whether the quench chamber designs were the same as Fiberweb France's because Fiberweb France's designs were secret. We find Superior's challenge to the jury's willfulness verdict, and the court's order upholding it, to be without merit.

### B. BBA Patent

■ Superior argues that the district court erred in construing the claims of BBA's '413 patent. Superior argues that "corona means," as a means-plus-function limitation, is limited to embodiments disclosed in the specification and equivalents, and the only embodiment disclosed in the '413 patent shows the corona means within the four walls of the attenuator. Superior argues that during prosecution, the applicant distinguished prior art by limiting the position of the corona means to be "within" the slot draw attenuator at a location above the exit slot of the attenuator. Superior argues that its accused device includes an electrostatic device positioned below the exit slot of the attenuator, and thus the claims, which require that a collection surface be positioned adjacent the exit slot, fail to read on the accused device.

The district court's claim construction of August 17, 2001, addressed the arguments raised by Superior on appeal. The district court agreed that the corona means of claim 1 is a means-plus-function limitation, but found that the claim also includes further language designating location, "positioned for electrostatically charging the filaments ... before they are deposited on said collection surface." The district court found that the language of the claim permits the corona means to be outside, albeit connected to, the attenuator. The district court addressed Superior's prosecution history argument but found that the prosecution history failed to limit the claims in the way argued by Superior.

Claim 1 recites, *inter alia,*

d) corona means cooperating with said attenuator and positioned for electrostatically charging the filaments so that repelling forces are induced in the filaments to more uniformly spread the filaments before they are deposited on said collection surface to form a web.

'413 patent, col. 9, ll. 32–37.

■ As the district court correctly concluded, the limitation "corona means" is in means plus function form, and thus is subject to the requirements of 35 U.S.C. § 112, paragraph six. *See B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424, 43 USPQ2d 1896, 1899 (Fed.Cir.1997) ("Because this limitation is expressed in 'means plus function' language and because it does not recite definite structure in support of its function, it is subject to the requirements of 35 U.S.C. § 112, ¶ 6 (1994)."). Construction of such a limitation requires the court to first identify the function of the means-plus-function limitation and next identify the corresponding structure in the written description necessary to perform that function. *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194

F.3d 1250, 1258, 52 USPQ2d 1258, 1263 (Fed.Cir.1999).

Superior argues that the recited function includes "for electrostatically charging the filaments . . . before they are deposited on said collection surface to form a web." We disagree. The district court correctly identified the recited function:

> The "function that corresponds to the "means" in this portion of Claim 1 stems from the word "corona"; that is, the claim is properly read as if it said "means for forming a corona."

Superior's proposed construction ignores the word "positioned" in claim 1, as the district court observed. Rather than reciting the function of the corona means, the expression following the word "positioned" describes where the corona means is located and is a separate limitation not subject to section 112, paragraph 6. What the "corona means" is and where it is located are two different things.

Superior's argument that the "corona means" must be "within" the slot draw attenuator is misplaced. The "within" limitation proposed by Superior does not appear in the claim. The prosecution history shows that the applicant described a prior art reference, Japanese Pat. No. 60–94663, by noting that it "discloses applying a corona to filaments after the filaments have exited an attenuator," but the applicant did not distinguish this reference on that basis. Instead, the applicant distinguished this reference as referring to *"tube-type round attenuators* and not to a slot draw attenuator," and having a different filament configuration. We can find no error in the district court's finding that the intrinsic evidence does not require that the corona means be "within" the attenuator.

Superior's argument that the claims fail to read on the accused device, due to the "adjacent" limitation, is similarly unpersuasive. Claim 1 recites, "a collection surface positioned adjacent said exit slot of said attenuator." '413 patent, col. 9, ll. 28–29. Superior's contention, that the collection surface cannot be adjacent the exit slot if the corona means is not within the attenuator, is without merit. Just because the corona means is located outside the attenuator, and connected to the attenuator, does not mean that the collection surface is precluded from being adjacent to the attenuator exit slot. Again, Superior invites us to ignore the "positioned" limitation in favor of restricting the corona means to that shown in the patent figures. Because Superior's construction reads a limitation out of the claims, we decline Superior's invitation.

We find Superior's arguments concerning claims 8, 9, and 13 to be unpersuasive for similar reasons.

## II. Cross–Appeals

### A. Reemay Trade Secret

■■■ Reemay argues that pursuant to the court's holding in *Servo Corp. of America v. General Electric Co.*, 393 F.2d 551, 157 USPQ 470 (4th Cir.1968), the district court was required to exclude from the evidence certain expired patents not relied upon by Superior in developing the accused technology. Reemay argues that *Servo* requires exclusion of references that do not "completely disclose[ ]" the trade secret or make the trade secret "so obvious as to render meaningless the confidential relationship" between the parties, if the reference was not actually relied upon by the accused. *Id.* at 555, 157 USPQ at 474. Reemay argues that the district court abused its discretion by admitting the expired patents and by refusing to

instruct the jury concerning the *Servo* case.

Superior argues that *Servo* did not address the issue presented in this case, whether the technology satisfied the criteria for protection as a trade secret. Superior contends that substantial evidence was presented at trial, not limited to the expired patents at issue, showing that Reemay's technology did not qualify for protection as a trade secret.

Initially, we note that the *Servo* case is not binding precedent. *Servo* involved interpretation of Virginia law, not South Carolina law, and thus the district court in this case was not necessarily bound by its interpretation of substantive trade secret law. *See Servo Corp. of Am. v. Gen. Elec. Co.*, 337 F.2d 716, 725 n. 2, 143 USPQ 85 n. 2 (4th Cir.1964).

*Servo* involved an allegation that GE had infringed two patents for "hot box detectors," devices used "in the railroad industry to detect an abnormal quantity of heat emanating from freight car journal boxes." 393 F.2d at 552, 157 USPQ at 471. The Fourth Circuit found the patents invalid, but concluded that GE had been unjustly enriched by willful copying of Servo Corp.'s device in breach of a confidential relationship between Servo Corp. and Southern Railway Co. *Id.* Servo had installed a device for testing and experimentation for Southern Railway Co., and on April 10, 1958, GE's engineering personnel inspected Servo's installation and obtained photographs, notes, drawings, and engineering data. *Id.*, 393 F.2d 551, 157 USPQ at 472. GE had attempted, and failed, to develop its own workable hot box detector near the close of 1955. *Id.*

The Fourth Circuit found that GE had misappropriated Servo's proprietary information, and remanded for a determination of damages, with an instruction that the district court was to base its determination on that portion of Servo's proprietary information which had not been publicly disclosed as of April 10, 1958, the date of misappropriation by GE. *Id.* at 553, 157 USPQ at 472. On remand, the district court concluded that "the Servo detector in its entirety had not been publicly disclosed," and awarded damages of $50,000. *Id.*

The Fourth Circuit again reversed and remanded. *Id.* The court found that the district court's findings lacked sufficient specificity regarding which information had been publicly disclosed. *Id.* at 556, 157 USPQ at 474. The court also commented on GE's defense that every significant aspect of the detector device had been publicly disclosed prior to April 10, 1958:

> We do not believe that in those instances where the extent of disclosure is arguable, and where the information had not been clearly placed in the public domain, General Electric should be allowed to avoid the consequences of the breach of confidence by piecing together in retrospect bits of information which had been disclosed in a variety of places and which as a combination were not clearly a matter of public knowledge.

> \*　\*　\*　\*　\*　\*

> Thus, should it appear that Servo made disclosures prior to April 10, 1958, unless these disclosures made its secret so obvious as to render meaningless the confidential relationship which had been established by Servo and Southern, they become irrelevant unless General Electric can show that it relied on them and did not appropriate the secret in its April 10, 1958 inspection.

*Servo,* 393 F.2d at 555, 157 USPQ at 473–74.

These statements by the Fourth Circuit in *Servo* were made in the context of "a breach of a confidential relationship." *Id.* The court considered the confidential relationship to be central to the cause of action, and any 'public disclosure' defense would of necessity have to be so sweeping as to negate that relationship, to avoid the consequences of breach:

> Servo cannot recover for appropriation of information which had been so completely disclosed to the public as to dispel the existence of a trade secret and thus to negate the confidential relationship which had been established by Servo and Southern between themselves.

*Id.* (citations omitted).

In the present case, the determination of whether Reemay's consolidator technology qualifies for trade secret protection does not turn on the breach of a confidential relationship. Thus, *Servo* is inapposite under these circumstances, and the district court did not abuse its discretion by refusing to instruct the jury concerning the case.

Reemay's argument that *Servo* mandates exclusion of certain unexpired patents is similarly unpersuasive. Superior introduced evidence that Reemay's consolidator technology was available in the prior art, and thus was not secret. Although Reemay contends that *Servo* decrees such evidence to be irrelevant if not sufficient to "render meaningless" a confidential relationship, Servo establishes no such rule outside the context of breach of a confidential relationship. The expired patents are relevant to the question of the existence of a trade secret under the SCTSA. *See* S.C.Code Ann. § 39–8–20(5) (Law Co-op.

Supp.2001). We can find no abuse of discretion by the district court in admitting this evidence.

### B. Fiberweb France Royalty Escrow Order

Fiberweb France challenges the district court's order staying imposition of the injunction prohibiting Superior from misappropriating Fiberweb France's trade secret, and directing that 10 percent of Superior's net sales be placed in escrow pending appeal. Fiberweb France argues that this order fails to account for Superior's sales during two months of the period of misappropriation, September and October of 2001. Whether and to what extent an injunction is awarded in this case are matters firmly within the discretion of the district court. *See* S.C.Code Ann. § 39–8–50(A) (Law Co-op. Supp.2001) ("Actual or threatened misappropriation *may* be enjoined." (emphasis added)). We find no abuse of that discretion here.

### CONCLUSION

Because the district court did not err in denying Superior's motions for JMOL and a new trial, we affirm on appeal. Because the district court did not abuse its discretion in admitting certain evidence and declining to instruct the jury on the *Servo* case, or in forming the escrow order, we affirm on cross-appeal.

*AFFIRMED.*

DYK, Circuit Judge, dissenting-in-part.

I join the majority opinion insofar as it holds that the district court properly denied Superior Nonwovens, L.L.C.'s motion for JMOL and a new trial as to infringe-

ment of BBA Nonwovens Simpsonville, Inc.'s patent, U.S. Patent No. 5,397,413 ("the '413 patent"), properly denied Reemay, Inc.'s motion for a new trial as to misappropriation of its trade secret, and did not abuse its discretion with respect to the escrow order. However, I respectfully dissent from the majority's decision upholding the jury determination that Fiberweb France SA ("Fiberweb France") demonstrated the existence of a protectable trade secret. In my view, JMOL should have been granted because no reasonable jury could properly conclude that Fiberweb France had proven that it had a protectable trade secret.

### 1. The particular number of zones is not itself a trade secret.

The majority opinion finds that Fiberweb France demonstrated a trade secret with respect to the particular number of zones in the quench chamber in the range of six to fifteen. (I refrain from identifying the particular number because of the majority's conclusion that the particular number of zones is a trade secret). I disagree that the particular number of zones in the quench chamber is a trade secret. An expired United States patent and a prior art publication plainly disclosed the use of multiple zones in a quench chamber.

United States Patent No. 3,274,644 to Massey et al. ("Massey") depicts a quench chamber "for quenching molten filaments" with fifteen horizontal zones and describes the use of sliding plate dampers to independently control air flow in each zone in "the melt spinning of filamentary materials of polymeric nature." Massey, col. 1, ll. 12–17, and Fig. 4. The patent shows two figures illustrating quench chambers with multiple horizontal zones

that can be independently controlled. *Id.* at Figs. 4, 5.

A book entitled *Formation of Synthetic Fibers* states that "[t]wo systems of cooling the hot filaments after they emerge from the spinnerette are in common use. The older and still more often used method commonly bears the name of cross-flow quench." Zbigniew K. Wakzak, *Formation of Synthetic Fibers* 151 (1977). Figure 5.1 of the book depicts a cross-flow quench chamber with six horizontal zones. *Id.* at 152. It is undisputed that the use of multiple zones in the quench chamber was generally known. Plaintiff's own expert Dr. Smorada acknowledged:

COUNSEL:

> Dr. Smorada, do you agree that the materials in expired patents that you reviewed in this case on the quench chamber show independently controlled zones from anywhere to 6 to 15 zones on quenches in the spunbond industry?

DR. SMORADA:

> There are a number of claims of multiple zone quenches.

To be sure, there was testimony that the particular number of zones selected by Fiberweb France was "very novel" and "very, very unusual." To establish a trade secret under South Carolina law, however, one must do more than assert that the information in question is "novel." Rather, one must show that the information *"derives independent economic value,* actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use." S.C.Code Ann. § 39–8–20(5)(a)(i) (emphasis added).

There was no showing that the particular number chosen had independent eco-

nomic value that would qualify it as a trade secret.

2. *There was no showing that the combination secret "differ[s] materially" from other methods revealed in the prior art.*

Alternatively the majority concludes that Fiberweb France demonstrated the existence of a combination trade secret consisting of the particular number of quench chamber zones combined with other known elements. *Ante* at 1340–41. Again I must disagree. The majority recognizes that *Lowndes Products, Inc. v. Brower*, 259 S.C. 322, 191 S.E.2d 761, 177 USPQ 209 (1972), governs this case. In accordance with *Lowndes*, a "unique combination of generally known elements or steps can qualify as a trade secret, if it represents a *valuable contribution* attributable to the independent efforts of the one claiming to have conceived it. *The combination must differ materially from other methods revealed by the prior art.* ..." 191 S.E.2d at 764, 177 USPQ at 211 (citing 2 *Callman, The Law of Unfair Competition, Trademarks, and Monopolies* § 53.3 (3d ed.1968)) (emphases added). This standard also appears in essence in the South Carolina Trade Secrets Act:

> A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures, which, although individually could be perceived as relatively minor or simple, collectively can make a *substantial difference in the efficiency of a process or the production of a product*, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.

S.C.Code Ann. § 39–8–20(5)(b) (Law Co-op. Supp.2001) (emphasis added). Thus the "material difference" standard requires a showing that the alleged combination secret represents a "valuable contribution," *i.e.*, that it has superior economic value over the prior art. This is in accord with general trade secret law. *See Rivendell Forest Prods., Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1046, 31 USPQ2d 1472, 1476 (10th Cir.1994) ("[A] trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and *valuable* integration of the public domain elements .... " (emphasis added)); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174, 17 USPQ2d 1054, 1056 (2d Cir. 1990) ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a *competitive advantage* ....") (emphasis added) (citation omitted); *Water Servs., Inc. v. Tesco Chems., Inc.*, 410 F.2d 163, 173, 162 USPQ 321, 329 (5th Cir.1969) (finding combination trade secret where the combination of generally known elements was "unique and *conferred a substantial competitive advantage* " in that "the company enjoyed unparalleled financial success during the four years competitors were unsuccessfully trying to duplicate the [trade secret].") (emphasis added).

The record here shows that there was a complete absence of proof that the use of a particular number of zones within the quench chambers in combination with other elements qualified as a trade secret under the "differ[s] materially" test. There was no testimony here making a comparison between this combination and

the prior art to show how they "differ[ed] materially" in terms of economic value. At oral argument plaintiff's counsel admitted that no comparison had been made between the alleged trade secret here and any other quench methods:

THE COURT:

Is there any testimony that this trade secret process, as compared to other technologies, made a substantial difference?

COUNSEL:

I don't know if they used those words specifically, but Dr. Eschbach said that "this was the best profile," which suggests a comparison in his mind. *We didn't submit evidence comparing A to B.*

(Emphasis added).

The testimony counsel referred to is that of Dr. Eschbach, who testified that:

COUNSEL:

So your contention is the number of zones in the vertical side and the horizontal is also trade secret?

. . .

MR. ESCHBACH:

For us, it's a trade secret. It's coming outside from our experience and we have defined it that *this profile is the best one.*

(Emphasis added).

The record evidence relied on by plaintiff is quite inadequate to establish that this alleged combination trade secret "differ[s] materially" from already known technology. Thus I would hold that plaintiff failed to establish the existence of a trade secret under South Carolina law.